SOUTHWESTERN INVESTMENT
COMPANY, Petitioner,

v.

Robert W. MANNIX, Respondent.

No. B–6337.

Supreme Court of Texas.

July 27, 1977.

Rehearing Denied Nov. 2, 1977.

756

Clayton & Stubblefield, Cleo G. Clayton, Jr., Amarillo, for petitioner.

Kelleher, Kunczt & Loveland, Robert M. Kunczt and James G. Boyle, Austin, for respondent.

SAM D. JOHNSON, Justice.

Application for writ of error was made to this court, and we handed down a per curiam opinion which gave our reason for refusing the writ with the notation "no reversible error." 20 Tex.Sup.Ct.J. 216 (March 5, 1977). On motion for rehearing, the writ of error was granted, and the per curiam opinion is withdrawn. The following opinion is substituted.

Robert Mannix, as debtor, sued Southwestern Investment Company [SIC] as assignee of a retail installment contract which allegedly contained nine violations of the Texas Consumer Credit Code, Texas Revised Civil Statutes Annotated, Article 5069–6.01, et seq.,[1] and seven violations of the federal Truth-In-Lending Act, 15 U.S. C.A., Section 1601, et seq., and Regulation Z, 12 C.F.R., Section 226.1, et seq.[2] SIC counterclaimed for the monthly payments, totaling $499.20, which would become due under the retail installment contract. The trial court found six violations of state law and five violations of federal law and granted Mannix' motion for summary judgment. SIC's counterclaim was dismissed. The trial court awarded Mannix $731.68 as statutory damages plus $1,000 attorneys' fees. SIC appealed the summary judgment rendered against it, but not the dismissal of its counterclaim. The court of civil appeals affirmed the summary judgment. 540 S.W.2d 747. We affirm the judgments of the trial court and the court of civil appeals.

Mannix purchased $1,181.04 worth of stereo equipment from Banner Sales Company in San Antonio. He made a cash down payment of $381.04 and executed a retail installment sales contract for the remaining balance of $800. Mannix agreed to purchase credit life insurance for $15.48, which increased the total amount financed to $815.48. The finance charge on the $815.48 was $182.92, representing an annual percentage rate of 20.24 percent and bringing the total of the twenty-four payments to $998.40. The $998.40 total was to be paid in twenty-four monthly installments of $41.60 each, commencing on February 22, 1974. Banner assigned the sales contract to SIC, which provided the form contract to Banner. Apparently, it is a normal procedure for Banner to contact SIC prior to the sale of goods by Banner to a consumer such as Mannix. If SIC agrees to purchase from Banner any contract executed by the consumer, SIC supplies Banner with the form contract which the consumer (in this case Mannix) is to sign. The pertinent portions of this contract are set out on following page:

---

1. Article 5069–6.01, et seq., originally enacted in 1967 and effective on January 1, 1968, was amended effective May 4, 1977. Unless indicated otherwise, the references herein to Article 5069–6.01, et. seq., pertain to the statute enacted in 1967.

2. References herein to federal laws or regulations pertain to those effective as of the date of the contract, January 23, 1974.

## FRONT OF CONTRACT

| NOTICE OF INTENDED CREDIT LIFE AND CREDIT DISABILITY INSURANCE MAY BE FOUND ON THE REVERSE SIDE |
|---|

### RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT

In consideration of the sale and delivery to the undersigned Buyer (hereafter called Debtor) of the following Goods and/or services, delivery and acceptance of which in conformity to the Contract in all respects is hereby acknowledged, Debtor agrees to pay therefor the following deferred payment price rather than the quoted cash price.

| DESCRIPTION OF GOODS OR SERVICES (GIVE MAKE OR TRADE NAME) | N or U | MODEL | SERIAL NO | PRICE |
|---|---|---|---|---|
| JBL Speakers | N | L-100 | | |
| Dual Turntable | N | 1229 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | |
|---|---|---|
| 1 CASH PRICE (Sales Tax $____) | $ | 1181.04 |
| TRADE-IN | $ | |
| CASH DOWN PMT. | $ | 381.04 |
| 2 TOTAL DOWN PAYMENT | $ | 381.04 |
| 3 UNPAID BALANCE OF CASH PRICE (Item 1 less 2) | $ | 800.00 |
| 4 Credit Life } For ORIGINAL | $ | 15.48 |
| 5 Disability } Contract Term | $ | — |
| 6 Property Ins ☐ Term____ mos. | $ | — |
| Describe coverage ____ | | |

| DESCRIPTION OF TRADE-IN | TO BE INSTALLED/KEPT AT |
|---|---|
| | |

| | | |
|---|---|---|
| 7 OFFICIAL FEES | $ | — |
| 8 UNPAID BALANCE—AMOUNT FINANCED (3+4+5+6+7) | $ | 815.48 |
| 9 FINANCE CHARGE | $ | 182.92 |
| 10 TOTAL OF PAYMENTS (Item 8+9) | $ | 998.40 |
| 11 DEFERRED PAYMENT PRICE (Item 2+10) | $ | 1379.44 |
| 12 ANNUAL PERCENTAGE RATE | | 20.24% |

**PROPERTY INSURANCE:** Property insurance, if written in connection with this transaction, may be obtained by Debtor through any person of his choice. The cost of property insurance, if obtained through Seller, is as set forth above.

☐ Unless checked here, the above insurance is sold for a premium not fixed or approved by the State Board of Insurance, and Buyer has the option for a period of five days from date hereof of providing equivalent coverage from any insurance company authorized to transact business in Texas.

**INSURANCE COVERAGES HEREIN DO NOT INSURE AGAINST LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS.**

### TERMS AND CONDITIONS

Debtor buys from the undersigned Seller (hereinafter called Secured Party), and the Secured Party sells to Debtor on the terms and conditions set forth hereunder and the TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE HEREOF and incorporated herein by reference as though set forth in detail, the Goods and/or services described above, to be installed/kept at the above indicated address. Debtor agrees to pay the TOTAL OF PAYMENTS designated herein to order of Secured Party in Amarillo, Potter County, Texas, with interest thereon after maturity at the highest legal contract rate.

Debtor agrees to pay a delinquency and collection charge on each installment in default for 10 days or more in an amount not exceeding 5% of such unpaid installment or $5.00 whichever is less, but not exceeding the lawful maximum.

Upon prepayment in full of this contract the purchaser will receive a refund credit based upon the "Rule of 78" applied to the amount of the finance charge after first deducting $12.00 or such other amount as may be permitted by law. Any unpaid delinquency charges may be deducted from such refund credit.

For good and valuable consideration and as security for the Total of Payments, Debtor hereby acknowledges, ratifies and confirms the existence of a security interest in the Goods described above to Secured Party, to have and to hold the same forever, upon the condition that if Debtor promptly pays or causes to be paid the aforesaid indebtedness and performs all of the terms and conditions hereof at the time and in the manner specified then, and only then, title and ownership to said Goods shall vest in the Debtor and this Contract shall be void, otherwise the security interest herein created to remain in full force.

Executed in quadruplicate in 23 day of January 1974

at San Antonio, Tex. Texas.

| |
|---|
| TOTAL OF PAYMENTS IS PAYABLE AS FOLLOWS: |
| In 24 monthly installments, commencing on the 22 day of Feb., 1974 and on the same day of each month thereafter each installment to be in the amount of $ 41.60, except the final installment which shall be $____, and in addition thereto installments as follows |
| $____ on ____ 19____ |
| $____ on ____ 19____ |
| (inapplicable if not filled in) |

**CREDIT INSURANCE AUTHORIZATION**

The undersigned voluntarily requests the following credit insurance and understands that such insurance is not required as a condition to this credit extension

☑ Credit Life Insurance
☐ Credit Disability Insurance

The undersigned acknowledges disclosure of the cost of such insurance as shown above and authorizes inclusion of the premiums in the balance payable under this obligation. Credit insurance will be placed on the person signing below unless otherwise indicated below.

X _Robert W. Hanna_ Date 1-23-74
Buyer

(Person to be insured if other than above signer)

**NOTICE TO THE BUYER:** Do not sign this contract before you read it or if it contains blank spaces. You are entitled to a copy of the contract you sign. Under the law you have the right to pay off in advance the full amount due and under certain conditions may obtain a partial refund of the time price differential (finance charge). Keep this contract to protect your legal rights. Debtor represents that he has read this contract, and it was completely filled in at the time of signing, and acknowledges receipt at the time of execution of a true executed copy hereof.

_Banner Sales_
Secured Party (Seller)
By _Michael E. O'Rea_
2322 Blanco Rd.
Seller's Address

X _Robert W. Hanna_
(Debtor(s) Buyer)

____
(Debtor(s) Buyer)

2736 ____ St #26
Mailing Address

## BACK OF CONTRACT

### CONDITIONS OF RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT

1. The Debtor acknowledges acceptance of delivery after thorough examination, of the foregoing Goods conforming to the contract in every respect, to be kept and/or installed at the place mentioned on the reverse side.

2. Debtor expressly agrees that the Goods purchased hereunder shall retain their status as personal property and shall not become fixtures notwithstanding their mode or method of installation. Nothing shall prevent the Secured Party from removing same from any premises to which same may be attached, upon default or breach of this Retail Installment Contract and Security Agreement or any part thereof, and the Debtor agrees to sustain the cost of repairs, if any, of any physical injury to the real estate caused by such removal.

3. Should the Debtor fail to pay said indebtedness or any part thereof when due, then the entire unpaid balance shall, at the Secured Party's option, become immediately due and payable and shall bear interest thereafter at the highest lawful rate, and the Secured Party may, without notice or demand, by process of law or otherwise, take possession of said Goods wherever located, and, with or without legal procedures, sell the same and all equity of redemption therein at public or private sale, and apply the proceeds after deducting all expenses and liens, to the payment of said indebtedness and interest and pay the Debtor the surplus, if any. If the net proceeds of such sale are insufficient to cover the amount unpaid hereunder, the Debtor agrees to pay any deficiency on demand. Secured Party shall have the right to enforce one or more remedies hereunder, successively or concurrently. Unless the Goods are perishable or threaten to decline speedily in value or are of a type customarily sold on a recognized market, the Secured Party will give the Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition is to be made. The requirement of reason-

able notice shall be met if such notice is mailed, postage prepaid, addressed to Debtor at the home address shown on the reverse side hereof, at least five days before the time of such sale or disposition.

4. The Debtor agrees to pay all costs of collecting any amount or enforcing any of the Secured Party's rights under this contract; including, without limiting the generality of the foregoing, a reasonable attorneys fee, it being agreed that 15% of the unpaid time balance and interest constitutes reasonable attorney's fee, if this contract is placed in the hands of an attorney, not a salaried employee of Secured Party, for collection or enforcement no matter whether suit is brought or not, or if collected through bankruptcy or probate proceedings.

5. The Debtor agrees to insure such Goods against loss by fire in favor of the Secured Party, its successors or assigns.

6. The Debtor agrees to pay promptly when due all licenses, taxes, and assessments which may be levied on such Goods and to keep the same at all times free and clear of any lien, encumbrance or charge except this contract.

7. The Debtor agrees to take good care of said Goods, and not to misuse, secrete, sell, encumber, remove the same from the premises described above, or otherwise dispose of or lose possession of said Goods, or to make any structural change in or addition to such Goods without first obtaining written consent from the Secured Party, its successors or assigns. Damage to or destruction of such Goods, however caused, shall not relieve Debtor of liability for the full price thereof, or of the liability hereunder. In event of the unauthorized sale or other disposition of said Goods., or any part thereof, Goods include proceeds thereof without implying any consent by Secured Party or its successors or assigns to such sale or other disposition.

8. The debtor agrees that this Retail Installment Contract and Security Agreement may at any time be assigned by the Secured Party without notice to the Debtor. All provisions herein set forth for the Secured Party's benefit shall inure to the benefit and operate in favor of Secured Party's successors and assigns. The Debtor further agrees that the Secured Party's successors and assigns shall be under no responsibility or obligation for the performance by Debtor of any term or condition hereof.

9. Title and ownership of said Goods, and the security interest herein created in said goods, shall remain in the Secured Party, its successors or assigns, until all sums due or which become due or owing under any clause of this contract shall have been fully paid in cash and all duties on the part of the Debtor shall have been fully performed, and thereupon the title and ownership shall pass to the Debtor and the security interest in the said goods shall terminate. The Debtor agrees that any labor or material furnished to him shall be added to, and become a part of the purchase price hereof, and that title and ownership to the property herein shall not pass until the same is fully paid and the security interest created in the said Goods shall not be terminated until the same is fully paid.

10. Time is of the essence of this contract and every part thereof.

11. All words herein shall be deemed to be of the number and gender properly applicable to the Debtor or Debtors. If there be more than one Debtor, their obligations hereunder shall be joint and several. All obligations of Debtor shall bind his heirs, executors, administrators, or his successors or assigns.

12. Any provision of this contract prohibited by law in any State shall, as to said State, be ineffective to the extent of such prohibition, without invalidating the remaining provisions of this contract.

13. The Debtor certifies and warrants and states that there does not now exist and there will not exist any othe. extension of credit in connection with the purchase of the goods above described other than evidenced by this Contract, except as may be evidenced by a Memorandum of Subsequent Purchase or Agreement of Subsequent Purchase between the Debtor and Secured Party. The Debtor warrants and states that the information set forth in the purchaser's statement on the reverse side hereof is true to the best of his knowledge. The undersigned Secured Party hereby accepts in good faith the foregoing statements of the Debtor and because of his reliance thereon agrees to extend the installment credit on the terms and conditions as set forth in said Contract.

14. It is agreed that no other agreement or guarantee, oral or written, express or implied, shall limit or qualify the terms of this contract, and that no warranty of said Goods has been made unless herein expressed. This contract is intended by the parties as a final expression of their agreement and also as a complete and exclusive encompassment of their agreement, not withstanding prior negotiations or trade usages to the contrary. This agreement shall not be binding on the Secured Party until his acceptance is signed hereon

Subsequent to the execution of this contract Mannix instituted this litigation. When SIC filed its counterclaim alleging "[t]here is presently due and owing by Cross-Defendant [Mannix] on such contract the sum of $499.20, exclusive of attorneys fees," Mannix was not and had not been behind in his payments. From the record it does not appear that Mannix was ever late in his payments.

The trial court found a total of eleven violations of the applicable law. The trial court held the following provisions of the contract violated Texas law:

1. The requirement that Mannix purchase fire insurance did not comply with Article 5069–6.02(5)(d), which requires the retail installment contract to disclose any separate charge included for insurance, specifying the type of insurance and the terms of coverage, or with Article 5069–6.-04, which allows the creditor to require the buyer to insure property sold, but which requires the contract to "state the kind, coverage, term and amount of premium for such insurance."

2. The delinquency charge provision failed to comply with Article 5069–6.02(11), which allows the creditor to include in the contract a provision for a delinquency charge only "on each installment in default for a period of more than ten days . . ."

3. The requirement that Mannix, the buyer, pay for any damages to real estate due to repossession and the provision which allowed forceable repossession violated Article 5069–6.05(4), which provides in pertinent part that "no retail installment contract or retail charge agreement shall: . . . (4) Provide for a waiver of the buyer's rights of action against the seller or holder or other person acting therefor for any illegal act committed in the . . . repossession of goods; . . ."

4. The deduction of unpaid delinquency charges from any refund of unearned interest upon prepayment did not comply with Article 5069–6.02(10), which allows the buyer to prepay in full at any time before the final due date and which sets forth the formula for the refund of the unearned interest upon such prepayment.

5. The deduction of $12 from any refund of unearned interest upon prepayment also violated Article 5069–6.02(10), and this deduction was not authorized by Article 5069–6.02(9)(e), which provides that the minimum time-price differential, i. e., interest, which may be charged on the retail installment contract in the instant case would be $12.

6. The acceleration of the unearned interest, if there was a default prior to the

final due date, did not comply with the formula for the refund of unearned interest contained in Article 5069–6.02(10).

The trial court, in addition, held the contract violated federal law in the following manner:

7. The placement of the provision for a security interest in after-acquired property violated Regulation Z, Section 226.8(a)(1), which provides that disclosures under the circumstances of the instant case required by Section 226.8(b)(5) shall be on "the same side of the page and above the place for the customer's signature; . . ." Section 226.8(b)(5), in pertinent part, requires: "A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit . . .. If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired."

8. The prepayment penalty of $12 violated Regulation Z, Section 226:6(a), which requires disclosures to be "made clearly, conspicuously, [and] in meaningful sequence," and Regulation Z, Section 226.8(a), and Section 226.8(b)(6), which together require the disclosure of "any penalty charge that may be imposed by the creditor or his assignee for prepayment of the principal of the obligation . . .."

9. The description of the security interest was inadequate and thereby violated Regulation Z, Section 226.8(b)(5).

10. The right of the creditor to accelerate the installments was not disclosed in accordance with Regulation Z, Section 226.-8(a)(1) and Section 226.8(b)(4), which require under the circumstances of the instant case the disclosure of penalties for default by the debtor on "the same side of the page and above the place for the customer's signature."

11. The terms "finance charge" and "annual percentage rate" were not printed more conspicuously than other required terminology in violation of Regulation Z, Section 226.6(a).

SIC appealed to the court of civil appeals urging each of these eleven findings as a point of error. The court of civil appeals affirmed on the basis of three violations. Two violations of state law were found by the court of civil appeals: Article 5069–6.-02(11) [point 2, ten-day late charge], and Article 5069–6.02(10) [point 6, acceleration of unearned interest]. One violation of federal law was found by the court of civil appeals: Regulation Z, Section 226.8(a)(1) [point 7, disclosure of security interest]. SIC appealed to this court contending there were not any violations of state or federal law and raised the same eleven points of error.

At this juncture, we note that our disposition of this case does not require a consideration of all eleven points raised by SIC. The parties stipulated that damages in the amount of $731.68 and reasonable attorneys' fees in the amount of $1,000 were to be awarded if there existed one violation of state law and one violation of federal law.[3] We also note that SIC has not raised at any point in these proceedings the defense of accidental and bona fide error nor any defense available to it because of its status as an assignee of the installment contract.

"In determining the meaning of a statute, the dominant consideration is to as-

3. The stipulation reflects the fact that a violation of Texas credit laws results in a recovery of statutory damages of twice the finance charge [Article 5069–8.01] and a violation of the federal law results in a recovery of statutory damages of twice the finance charge with a minimum recovery of $100 and a maximum recovery of $1,000 [15 U.S.C.A. § 1640]. In this case, one violation of state law results in statutory damages of $365.84 [two times $182.92, the finance charge] and one violation of federal law results in statutory damages of $365.84, which totals $731.68.

Article 5069–8.01, et seq., which sets forth the remedies available for a violation of Texas credit laws was amended in 1977 by the 65th Legislature, Regular Session. The amendment does not affect the damages awarded in the instant case.

certain the intention of the Legislature . . . This intention is to be found in the language of the statute itself." *Jones v. Del Andersen and Associates,* 539 S.W.2d 348, 350 (Tex.1976). "An equally fundamental rule of statutory construction is that the intention of the Legislature must be ascertained from the entire Act, and not from isolated portions thereof." *Calvert v. Texas Pipe Line Company,* 517 S.W.2d 777, 781 (Tex.1974).

When construing the statutes involved in SIC's points of error, this court must not only be guided by these two rules of interpretation, but also the purpose expressed by the Legislature in the following declaration of intent:

"(1) Many citizens of our State are being victimized and abused in various types of credit and cash transactions. These practices impose a great hardship upon the people of our State.

"(2) Credit in its various forms is one of the most essential and vital elements of our economy. It can be truly said that credit affects every citizen every day. Credit transactions in our State amount to many billions of dollars per year.

"(3) Credit abuses now existing in our State stem from the fact that many types of credit transactions are not now subject to effective public regulation and control and the penalties imposed for usury do not provide effective or workable safeguards in this vital area of economic activity.

"(4) Such abuses are especially prevalent in the area of consumer transactions both cash and credit. Unscrupulous operators, lenders and vendors, many of whom are transient to our State, are presently engaged in many abusive and deceptive practices in the conduct of their businesses. These unregulated practices bring great social and economic hardship to many citizens of our State. They impose intolerable burdens on those segments of our society which can least afford to bear them—the uneducated, the unsophisticated, the poor and the elderly.

"(5) These facts conclusively indicate a need for a comprehensive code of legislation to clearly define interest and usury, to classify and regulate loans and lenders, to regulate credit sales and services, and place limitations on charges imposed in connection with such sales and services, to provide for consumer education and debt counseling, to prohibit deceptive trade practices in all types of consumer transactions, and to provide firm and effective penalties for usury and other prohibited practices.

"(6) It is the intent of the Legislature in enacting this revision of Title 79 of the Revised Civil Statutes of Texas, 1925, to protect the citizens of Texas from abusive and deceptive practices now being perpetrated by unscrupulous operators, lenders and vendors in both cash and credit consumer transactions and to implement the mandate of Section II of Article XVI of the Constitution of Texas which authorizes the Legislature to classify loans and lenders, license and regulate lenders, define interest and fix maximum rates of interest, and thus serve the public interest of the people of this State." Declaration of Legislative Intent, Texas Laws 1967, Chapter 274, Section 1, at 608. Texas Revised Civil Statutes Annotated, Volume 15, pp. 1–2 (1971).

## VIOLATIONS OF STATE LAW

FIRE INSURANCE: At the outset, SIC urges a point not considered by the court of civil appeals. SIC argues that there was no violation of Article 5069–6.02(5)(d) or Article 5069–6.04, both of which concern property insurance.

■ Clearly there was no violation of Article 5069–6.02(5)(d). The pertinent text of that provision is as follows:

"The retail installment contract shall contain and disclose the following items:

". . ..

"(d) The aggregate amount, if any, included for insurance, *if a separate identified charge is made therefor,* specifying the type or types of insurance and the term or terms of coverage; . . ." [Emphasis added.]

The contract in issue indicates no "separate identified charge . . . made" for property insurance. Since Mannix was not *charged* by SIC for any property insurance, it was not necessary for the information required by Article 5069–6.02(5)(d) to be contained in the installment contract.

Although Article 5069–6.02(5)(d) was not violated, Article 5069–6.04 was. It provides in pertinent part:

"(2) A seller or holder may . . . request or require a buyer to insure property involved in such [retail installment] contract or agreement, . . .

"(3) When insurance is required in connection with such a contract or agreement made under this Chapter, the seller or holder shall furnish the buyer a statement which shall clearly and conspicuously state that insurance is requested or required in connection with the contract, . . . [and]

"(5) *The contract or agreement must state the kind, coverage, term and amount of premium for such insurance.*" [Emphasis added.]

SIC argues there was no requirement for any insurance under this retail installment contract. An examination of the instrument refutes this contention. The following provision is contained on the back of the installment contract: "5. The Debtor agrees to insure such Goods against loss by fire in favor of the Secured Party, its successors or assigns." There are no marks of any kind on the contract to indicate that this provision was to be deleted. SIC maintains that the placement of what appears to be a zero in the blank opposite Item 6 [Item 6 reproduced below* refers to property insurance and appears on the front of the contract], and the failure to complete the remaining blanks contained in Item 6 indicates no insurance was required. To the contrary, it is obvious that this blank opposite Item 6 was intended to be used to comply with Article 5069–6.02(5)(d), which requires the creditor to set forth the cost of such property insurance when acquired through the creditor; not Article 5069–6.04, which requires the creditor to set forth the "kind,

coverage, term and amount of premium for such insurance." The failure to complete the remaining blanks in Item 6 does not in any way indicate that the provision requiring Mannix to purchase fire insurance was to be deleted from the contract.

| | | |
|---|---|---|
| 1 CASH PRICE (Sales Tax $ ____) | $ | //8/.04 |
| TRADE-IN $ ____ | | |
| CASH DOWN PMT. $ 38/.04 | | |
| 2 TOTAL DOWN PAYMENT | $ | 3 8/.04 |
| 3 UNPAID BALANCE OF CASH PRICE (Item 1 less 2) | $ | 800.00 |
| 4 Credit Life } For ORIGINAL | $ | 15.48 |
| 5. Disability } Contract Term | $ | — |
| 6 Property Ins. ☐ Term___mos. | $ | — |
| Describe coverage ___ | | |
| 7 OFFICIAL FEES | $ | — |
| 8 UNPAID BALANCE—AMOUNT FINANCED (3+4+5+6+7) | $ | 8/5.48 |
| 9 FINANCE CHARGE | $ | /82.9a |
| 10 TOTAL OF PAYMENTS (Item 8+9) | $ | 998.00 |
| 11 DEFERRED PAYMENT PRICE (Item 2+10) | $ | /379.44 |
| 12 ANNUAL PERCENTAGE RATE | | 20.24% |

Since there was nothing to indicate that the provision on the back of the contract was not to be applied to this transaction, that is, it was not struck out, it was necessary for the contract to state "the kind, coverage, term and amount of premium for such insurance." The failure to include this information was a violation of Article 5069–6.04. *See McDonald v. Savoy*, 501 S.W.2d 400 (Tex.Civ.App.—San Antonio 1973, no writ).

DELINQUENCY
CHARGE: ■ SIC next maintains that the following provision of its contract, that "Debtor agrees to pay a delinquency and collection charge on each installment in default *for 10 days or more*," does not violate Article 5069–6.02(11). The pertinent part of Article 5069–6.02(11) states that the "holder of any retail installment contract if it so provides may collect a delinquency charge on each installment in default for a period of *more than ten days* . . .." According to SIC, the contract phrase "in default for 10 days or more" is equivalent to the statutory phrase "in default for . . . more than ten days." Mannix argues that under the contract provision a penalty can be assessed on the tenth day.

We reject this argument. The installment must have been "in default for 10 days," which plainly means that a delinquency charge cannot be imposed until the expiration of ten days. In order to be "in default for 10 days," the tenth day must have passed without payment; the earliest that a delinquency charge could be imposed under this contract is on the eleventh day, as the statute requires. Thus, the trial court and the court of civil appeals erroneously held there was a violation of Article 5069–6.-02(11).

WAIVER OF RIGHTS: ▮ Although the trial court found a violation of Article 5069–6.05, the court of civil appeals did not consider this third point of error. In pertinent part, Article 5069–6.05 provides:

"No retail installment contract or retail charge agreement shall:

" . . . .

"(4) Provide for a waiver of the buyer's rights of action against the seller or holder or other person acting therefor for any illegal act committed in the collection of payments under the contract or agreement or in the repossession of goods;

. . . ."

Mannix argues that this Article is violated by the following provision contained on the back of the contract:

"Nothing shall prevent the Secured Party from removing [the property] from any premises to which same may be attached, upon default or breach of this Retail Installment Contract and Security Agreement or any part thereof, and the Debtor agrees to sustain the cost of repairs, if any, of any physical injury to the real estate caused by such removal."

This provision of the contract does indeed waive the buyer's cause of action for any tort committed in the repossession of the goods. Since "[n]othing shall prevent the Secured Party from removing [the property] from any premises to which same may be attached, upon default or breach," SIC could, for example, forcefully enter Mannix' home. Furthermore, in this example, Mannix would have to absorb "the cost of repairs, if any, of any physical injury" to his home as a result of such forceable entry even though the injury was a result of intentionally tortious conduct. It is well-settled that such a provision would not be enforced by the courts of Texas. First, a breach of the peace during repossession would violate Article 9.503, Texas Business and Commerce Code.[4] Second, such unconscionable conduct would not be excused by a provision contained in a form contract resulting from unequal bargaining positions. *See Exxon Corporation v. Brecheen*, 526 S.W.2d 519 (Tex.1975); *Crowell v. Housing Authority of City of Dallas*, 495 S.W.2d 887 (Tex.1973); *Western Union Tel. Co. v. Linn*, 87 Tex. 7, 26 S.W. 490 (1894); *Cameron Compress Co. v. Whitington*, 280 S.W. 527 (Tex.Com.App.1926, jdgmt adopted); Comment, *The Doctrine of Unconscionability*, 29 Baylor L.R. 309 (1977). Thus, the Legislature must not only have intended such an unconscionable contract provision to continue to be unenforceable, but also to penalize any creditor who included such a prohibited provision in a retail installment contract. The presence of such a clause in a retail installment contract would deceive the very individuals the Legislature intended to protect; namely, "the uneducated, the unsophisticated, the poor and the elderly" into believing that their creditors could, with the law's blessing, forcibly enter their homes at any time of the day or night and remove their goods without any concern for damages to the debtor's real property. Accordingly, the Legislature must have intended for Article

---

**4.** "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. *In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace* or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under Section 9.504." [Emphasis added.]

5069–6.05 to impose a duty upon the creditor not to include such an unconscionable provision in the installment contract.

This same conclusion that the creditor has a duty to prepare a contract in accordance with the standards established by the Legislature by the Texas credit laws was reached in *Mitchell Motors, Inc. v. Bell*, 528 S.W.2d 856 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.). *Bell* involved a violation of Article 5069–7.02(2), which provided in pertinent part that the "printed portion of the [motor vehicle installment] contract . . . shall be in size equal to at least eight-point type." The court reasoned:

"In view of the clear legislative intent to protect buyers by preventing abusive and deceptive practices by sellers, and to achieve this objective by regulating the conduct and activities of sellers, there can be no doubt that the legislature intended to achieve its goal by *imposing duties* on the persons who, in the legislative judgment, had, under the old law, been guilty of abusive and deceptive practices. Thus, there can be no doubt that the purpose of Article 7.02 was to *impose duties* on sellers, the persons who, in the ordinary course of business, as did defendant here, present to the buyer a document ready for the buyer's signature. Regulation presupposes control by imposition of rules and standards to be followed, and it would be nonsensical to hold that the legislature sought to impose rules and standards to be followed by sellers without *imposing a duty* on the regulated persons to comply with such rules and standards. To attempt to regulate the conduct of a class of persons without *imposing duties* on the members of the regulated class would be an attempt to regulate by not regulating. It is obvious that, if the legislative attempt to protect the credit buyers of motor vehicles is to be regarded as anything other than an exercise in futility, *the legislative pronouncements concerning the form and contents of the retail installment contract must be construed as imposing duties on the seller,* since it is the conduct of the seller which the legislature sought to reg-

ulate." 528 S.W.2d 856 at 860. [Emphasis added.]

*See* Snell, *Assignee Liability Under the Texas Consumer Credit Code,* 8 St. Mary's L.J. 696 (1977). The inclusion of this prohibited item in the contract which waived Mannix' right of action for certain illegal acts which might be committed in the repossession of goods subjected SIC to the penalties provided for in Article 5069–8.01, which provides in pertinent part:

"Any person who violates this Subtitle . . . *by failing to perform any duty specifically imposed on him* by any provision of this Subtitle, shall forfeit to the obligor twice the amount of interest or time price differential . . . charged or received, and reasonable attorneys' fees fixed by the court, provided that there shall be no penalty for a violation which results from an accidental and bona fide error." [Emphasis added.]

DEDUCTION
OF
DELINQUENCY
CHARGES: Under points four and five, SIC argued the contract provisions relating to delinquency charges did not violate Article 5069–6.02(10). Having found two violations of state law, we do not need to consider these two points raised by petitioner SIC.

ACCELERATION
OF UNEARNED
INTEREST: Because point of error six was considered by the court of civil appeals, we feel it appropriate to comment on this item.

■ The contract provides: "Should the Debtor fail to pay such indebtedness or any part thereof when due, then the entire unpaid balance shall, at the Secured Party's option, become immediately due and payable and shall bear interest thereafter at the highest lawful rate, . . ." Mannix alleged that by using the phrase "entire unpaid balance" this provision provided for the acceleration of the principal and of the unearned interest upon default and that such provision violated Article 5069–6.-

02(10). That Article provides in pertinent part: ". . . any buyer may prepay in full the unpaid time balance thereof at any time before its final due date and, if he does so, shall receive a refund [of unearned interest] thereon for such prepayment." The contract provision, however, does not concern a prepayment situation. Instead, the contract provision relates to a default by the buyer. Once the debt has been accelerated upon default, it is then due and owing. It is not possible for the buyer, Mannix, to prepay at that point in time. Therefore, Article 5069–6.02(10), which regulates prepayment, does not apply. Moreover, it is clear, from an examination of the contract, that the above-cited provision does not contemplate the acceleration of unearned interest. The term "unpaid balance" obviously refers to the unpaid principal; the unpaid portion of the amount which was originally financed. On the front of the contract the term "unpaid balance" was used in two places. First in the phrase "UNPAID BALANCE OF CASH PRICE," which was $800, and second in the phrase "UNPAID BALANCE—AMOUNT FINANCED," which was $815.48, which included the cash price and the cost of credit life insurance. Thus, the phrase "unpaid balance" does not refer to the total of payments that have not been made under the contract, but rather to the unpaid principal; the amount of the "total of payments" still outstanding, less any unearned interest. Accordingly, the contract language does not violate Article 5069–6.02(10) by accelerating unearned interest upon default.

With respect to the argument that there was an attempt by SIC to accelerate the unearned interest, the court of civil appeals apparently held the assertion by SIC of a counterclaim against Mannix, which recited "[t]here is presently due and owing by Cross-Defendant [Mannix] on such contract the sum of $499.20, exclusive of attorneys fees," was equivalent to an acceleration of the unearned interest. At the time the counterclaim was made, the sum of $499.20 included unearned interest. It should be noted that the record in this case indicates that Mannix has never been in default.

While it is clear that the court of civil appeals was correct in holding that an acceleration of unearned interest upon default in the instant case would be a violation of Article 5069–8.01, which prohibits charging usurious interest, *Moore v. Sabine National Bank of Port Arthur,* 527 S.W.2d 209 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.), we need not decide whether this counterclaim asserted by SIC was indeed an attempt to accelerate unearned interest inasmuch as we have already found two violations of state law.

## VIOLATIONS OF FEDERAL LAW

SECURITY

INTEREST: ▮ In its seventh point of error SIC maintains it did not violate Regulation Z, Section 226.8, which provides in pertinent part as follows:

"(a) . . . all of the disclosures shall be made together on either:

"(1) The note or other instrument evidencing the obligation on the *same side of the page and above the place for the customer's signature;* . . .

". . . ..

"(b) . . . In any transaction subject to this section, the following items, as applicable, shall be disclosed:

". . . ..

"(5) A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, . . . *If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired."* [Emphasis added.] Therefore, under Regulation Z, Section 226.8, any security interest in after-acquired property and future indebtedness secured by the goods sold must have been disclosed in this case on the front or first page of the document. The contract contained the following provisions regarding the security interest retained by SIC:

1. [Contained on the front of the document.] "For good and valuable consideration and as security for the Total of Payments, Debtor hereby acknowledges, ratifies and confirms the existence of a security interest in the Goods described above to Secured Party, to have and to hold the same forever, upon the condition that if Debtor promptly pays or causes to be paid the aforesaid indebtedness and performs all of the terms and conditions hereof at the time and in the manner specified then, and only then, title and ownership to said Goods shall vest in the Debtor and this Contract shall be void, otherwise the security interest herein created to remain in full force."

2. [Contained on the back of the document.] "Title and ownership of said Goods, and the security interest herein created in said goods, shall remain in the Secured Party, its successors or assigns, until all sums due or which become due or owing under any clause of this contract shall have been fully paid in cash and all duties on the part of the Debtor shall have been fully performed, and thereupon the title and ownership shall pass to the Debtor and the security interest in the said goods shall terminate. *The Debtor agrees that any labor or material furnished to him shall be added to, and become a part of the purchase price hereof, and that title and ownership to the property herein shall not pass until the same is fully paid and the security interest created in the said Goods shall not be terminated until the same is fully paid.*" [Emphasis added.]

This second provision, which was contained on the back of the document, creates a security interest in certain after-acquired property and uses the goods sold under this contract to secure certain future indebtedness and was clearly required to be disclosed on the front of the document under Regulation Z, Section 226.8(b)(5). Thus, the court of civil appeals correctly found a violation of this federal regulation.

Having found one violation of federal law, we decline to consider the other points of error raised by petitioner SIC relating to federal law.

The judgment of the court of civil appeals is affirmed.

BARROW, J., not sitting.

## ON MOTION FOR REHEARING

In reviewing our opinion on motion for rehearing the court has determined that certain clarifications and modifications should be made in the construction of Article 5069–6.04, Texas Revised Civil Statutes Annotated. In construing paragraph (5) of Article 5069–6.04 the court held that where a retail installment contract requires insurance the agreement must specify the "kind, coverage, term and amount of premium" for each insurance coverage required. In so holding the court did not distinguish between buyer-provided and seller-procured insurance. After reconsidering Article 5069–6.04 the court is of the opinion that this limited but necessary distinction should be made.

The meaning of Article 5069–6.04(5) is ambiguous because the antecedent for the term "such insurance" is unclear. In order to properly construe paragraph (5) in accordance with legislative intent it is necessary to read the statute as a whole rather than isolated portions thereof. *Calvert v. Texas Pipe Line Company,* 517 S.W.2d 777 (Tex.1974). Article 5069–6.04 provides as follows:

"(1) On any retail installment contract or retail charge agreement made under the authority of this Chapter, a seller or holder may request or require a buyer to provide credit life insurance and credit health and accident insurance as additional protection for such contract or agreement and include the cost of such insurance as a separate charge in such contract or agreement. Only one policy of life insurance and one policy of health and accident insurance on any one buyer

may be in force with respect to any one contract or agreement at any one time.

"(2) A seller or holder may, in addition, request or require a buyer to insure property involved in such contract or agreement, made under the authority of this Chapter, and include the cost of such insurance as a separate charge in such contract or agreement. Such insurance and the premiums or charges thereon shall bear a reasonable relationship to the amount, term and conditions of the contract or agreement, the existing hazards or risk of loss, damage or destruction, and shall not provide for unusual or exceptional risks or coverages which are not ordinarily included in policies issued to the general public.

"(3) When insurance is required in connection with such a contract or agreement made under this Chapter, the seller or holder shall furnish the buyer a statement which shall clearly and conspicuously state that insurance is requested or required in connection with the contract, and that the buyer shall have the option of furnishing the required insurance either through existing policies of insurance owned or controlled by him or of procuring and furnishing equivalent insurance coverages through any insurance company authorized to transact business in Texas. In addition when any requested or required insurance is sold or procured by the seller or holder at a premium or rate of charge not fixed or approved by the State Board of Insurance, the seller or holder shall include such fact in the foregoing statement, and the buyer shall have the option for a period of five days from the date of the contract or agreement of furnishing the required insurance coverage either through existing policies of insurance owned or controlled by him or of procuring and furnishing equivalent insurance coverage through any insurance company authorized to transact business in Texas. Such statement or statements may be made in conjunction with or as part of the retail installment contract required by Article 6.02 or the retail charge agreement required by Article 6.03, respectively.

"(4) Such insurance shall be written at lawful rates and in accordance with the provisions of the Texas Insurance Code by a company authorized to do business in this State.

"(5) The contract or agreement must state the kind, coverage, term and amount of premium for such insurance.

"(6) The buyer shall have the privilege at the time of execution of the contract or agreement of purchasing such insurance from an agent or broker of his own selection and of selecting an insurance company acceptable to the seller or holder, but, in such case the inclusion of the insurance premium in the contract or agreement shall be optional with the seller or holder.

"(7) If the insurance is to be procured by the seller or holder, he shall, within forty-five days after delivery of the goods or furnishing of the services under the contract or agreement, deliver, mail, or cause to be mailed to the buyer at his address as specified in the contract or agreement, a policy, or policies, or certificates of insurance, clearly setting forth the amount of the premium, the kind or kinds of insurance, the coverages and all the terms, options, limitations, restrictions and conditions of the policy or policies of insurance.

"(8) If the insurance is cancelled, adjusted or terminated for any reason, the refund for unearned insurance premiums received by the seller or the holder shall be credited to the final maturing installments of the retail installment contract or retail charge agreement, and the remaining balance of the unearned insurance premiums shall be refunded to the buyer; provided, however, that no cash refund shall be required if the amount thereof is less than One Dollar.

"(9) Any gain, or advantage to the seller or holder, or any employee, officer, director, agent, general agent, affiliate or associate from such insurance or its provision or sale shall not be considered as an additional charge or further time price differential in connection with any con-

tract or agreement made under this Chapter except as specifically provided herein."

The term "such insurance" is used in paragraphs (1), (2), (4), (5), (6), and (9). No ambiguity is created by the use of the term in paragraphs (1) and (2); under normal grammatical rules of construction, the antecedent is provided internally within each paragraph and refers to the types of insurance described in that paragraph. Therefore, "such insurance" refers to credit life and/or health and accident insurance in paragraph (1) and refers to credit property insurance in paragraph (2).

The ambiguity in the statute results from the use of the phrase "such insurance" in paragraphs (4), (5), (6), and (9). None of these paragraphs provide an antecedent internally. As all of these paragraphs are part of Article 5069–6.04, it is logical to conclude that all four paragraphs have the same antecedent; therefore, the antecedent is provided somewhere within paragraphs (1), (2), or (3). Upon analysis, paragraphs (1) and (2) are the only paragraphs which describe types of insurance. Paragraph (1) specifies that credit life and/or health and accident insurance may be required in a retail charge or installment agreement and the cost may be included therein. Paragraph (2) outlines similar specifications concerning credit property insurance. On the other hand, the principal purpose of paragraph (3) is to establish the burden of disclosure placed on the seller or holder,[1] who requires insurance in a retail charge or installment contract. The entire focus of paragraph (3) is on the contents of an insurance requirement clause in the contract. Paragraph (3) requires: that the disclosure be in clear and conspicuous language; that it provide an option allowing the buyer to obtain insurance from another source or to provide it from existing policies; and that it state that rates and premiums are not set or approved by the State Board of Insurance, if applicable. Therefore, a review of the initial three paragraphs of Article 5069–6.04 reveals that the only paragraphs which deal directly and purposefully to define insurance are paragraphs (1) and (2). Accordingly, the most appropriate and reasonable antecedent for the phrase "such insurance" is jointly provided by paragraphs (1) and (2).

Having determined that paragraphs (1) and (2) provide the antecedent for "such insurance," the court must determine what insurance is described by these paragraphs. Paragraph (1) deals specifically with credit life and/or health and accident insurance which is required by the seller *and* for which a charge is included in the contract. Paragraph (2) concerns property insurance which is required by the seller *and* for which a charge is included in the contract. Including the cost in the contract indicates that the seller has sold the insurance policy to the buyer, that the seller is financing the insurance acquired by the buyer from other sources, or that the seller in some manner has been involved in the procurement of the insurance coverage. Therefore, both paragraphs (1) and (2) refer strictly to seller-procured insurance. This type of insurance is distinguishable from buyer-provided insurance which is available as a mandatory option under paragraph (6); whereby the buyer may provide insurance coverage from existing policies or obtain insurance from another source. Therefore, it is the opinion of the court that "such insurance" refers only to seller-procured insurance. However, this court construes the term "seller-procured insurance" to include any insurance coverage whereby the seller becomes involved in the insurance acquisition process or directly or indirectly benefits from such insurance coverage. This involvement may be accomplished by actual sales of insurance policies, referrals to insurance agencies, re-

---

1. Article 5069–6.04 consistently refers to "seller or holder" in paragraphs (1), (2), (3), (6), (7), (8), and (9). This repeated utilization of the terms obviously demonstrates the intention of the Legislature to include all sellers, holders, or creditors involved in retail installment contracts or retail charge agreements. Accordingly, in this writing the words "seller" and "seller-procured" are to be understood to include "holder" and "holder-procured," as well as "creditor" and "creditor-procured."

ceipts of direct or hidden commissions, financings of insurance purchases from other sources, or by other similar devices. Only that insurance obtained totally independent of the seller and from which the seller will obtain no direct or indirect benefit from the procuring of the required insurance shall be considered "buyer-provided."

▆▆▆ In construing Article 5069–6.04 the court must determine if its construction is reasonable and comports with the legislative intent. *McKinney v. Blankenship*, 154 Tex. 632, 282 S.W.2d 691 (1955); *Anderson v. Penix*, 138 Tex. 596, 161 S.W.2d 455 (1942). As noted in its Declaration of Legislative Intent,[2] the Texas Consumer Credit Code was intended to prevent abusive credit practices and deceptive trade practices. Abuse in the area of insurance requirements in credit transactions has been prevalent in at least two areas in the past: (1) the practice of charging for insurance coverage which the buyer had no notice he was buying; and (2) the practice of requiring insurance and selling it at exorbitant prices without giving the buyer the opportunity to acquire better terms.[3] These abuses clearly arise when the insurance is procured, as broadly construed herein, by the seller; therefore, the present construction of Article 5069–6.04 would prevent the occurrence of either abuse in the future. Furthermore, the determination that "such insurance" excludes buyer-provided insurance reaches a reasonable result. Such construction avoids the impractical result of a seller having to monitor the terms, premiums, and coverage of new or existing policies purchased or owned by the buyer where such information is more readily available to the buyer than the seller.

Therefore, the statutory language, as well as the legislative intent, supports the interpretation of "such insurance" to include only life, health and accident, and/or property insurance which is seller-procured. Having determined the proper interpreta-

tion of "such insurance," the court must now reconsider its construction of Article 5069–6.04(5) as it relates to the retail installment contract assigned to Southwestern Investment Company.

▆▆▆ Article 5069–6.04(5) requires disclosure of the kind, coverage, term, and amount of premium of seller-procured insurance. Therefore, any time the seller becomes involved in the insurance acquisition process or directly or indirectly benefits from such insurance coverage, these paragraph (5) provisions must be included in the contract. In the instant case Southwestern Investment Company required Mannix to purchase fire insurance in section 5 of the installment contract, which reads:

"5. The Debtor agrees to insure such Goods against loss by fire in favor of the Secured Party, its successors or assigns."

There are no marks to indicate that this provision was to be deleted; however, no separate identified charges were listed in the contract for property insurance. Therefore, from the facts and documents before this court it appears that the seller was not involved in the insurance acquisition process nor did the seller benefit directly or indirectly from the insurance coverage. Such findings support the conclusion that the property insurance was not seller-procured; therefore, compliance with Article 5069–6.04(5) was not required.

This modification of the prior opinion of this court does not change the result. The parties stipulated that damages would be paid if there existed one violation of state law and one violation of federal law. The holding in the prior opinion is not modified with respect to the holding that Southwestern Investment Company violated Article 5069–6.05 in waiving the buyer's cause of action for any tort committed during repossession; nor is the holding modified with respect to the finding that Southwestern Investment Company violated Section 226.8

**2.** Declaration of Legislative Intent, 15 Tex.Rev. Civ.Stats.Ann., at 1–2.

**3.** Texas Finance Commission, Report to the 60th Legislature on Consumer Credit Abuses in

Texas, at 39–41; Davis, *Does the Texas Credit Insurance Act "Legalize" Usury?*, 11 Sw.L.J. 139 (1957).

of Regulation Z, 12 C.F.R., Section 226.1, *et seq.*, by not disclosing the security interest in after-acquired property on the front of the credit agreement. Having found one violation of state law and one violation of federal law, the judgment of the court of civil appeals is affirmed.

The motion for rehearing is overruled.