**FORD MOTOR CREDIT COMPANY,**
**Appellant,**

v.

**John M. BLOCKER et ux., Appellees.**

**No. 6629.**

Court of Civil Appeals of Texas,
El Paso.

Oct. 26, 1977.

Rehearing Denied Nov. 23, 1977.

494

Sawtelle, Goode, Davidson & Troilo, Terry Topham, San Antonio, for appellant.

Law Office of Pat Maloney, Inc., J. Pat Maloney, Bayne, Snell & Krause, Barry Snell, San Antonio, for appellees.

## OPINION

WARD, Justice.

The Plaintiffs, John M. Blocker and Rosemary Blocker, purchased a mobile home at the sales lot of Mobile America Sales Corporation and assumed the payments that were then owing to Ford Motor Credit Company on an outstanding retail installment contract. The Plaintiffs subsequently sued Ford Motor Credit Company and Mobile America Sales Corporation for penalties arising out of alleged violations of the Texas Consumer Credit Code, Tex.Rev.Civ.Stat. Ann. art. 5069–7.01, et seq., and of the Federal Truth-in-Lending Act, 15 U.S.C.A. Sec. 1631, and Federal Reserve Regulation Z, 12 C.F.R. Sec. 226.1, et seq. As a result of Plaintiffs' motion for partial summary judgment, they recovered judgment against Ford Motor Credit Company for $1,000.00 for violation of the federal law, and as a result of the trial of the balance of the case before a jury they have recovered additional judgment against Ford Motor Credit Company for $22,071.40 for violations of the Texas Consumer Credit Code together with attorney's fees. During the trial, the Plaintiffs settled their problems with Mobile America Sales Corporation and Ford Motor Credit Company is the only Appellant. We affirm.

Mobile America Sales Corporation is in the business of selling mobile homes to the pubic. The mobile home in question was originally sold by Mobile America under a retail installment contract dated December 26, 1973, to Kenneth Ray Miller and his wife. That contract and the security interest created therein were transferred and assigned by Mobile America to Ford Motor Credit Company. Under an agreement between the retailer and Ford Credit, when a buyer defaulted on any installment contract, Ford Credit could either demand that the retailer repurchase the contract and all interest that Ford Credit had in the security, or the retailer could continue to make the monthly payments due on the contract and hold the contract open for transfer on an assumption basis. In the latter event, the mobile home would be placed upon Mobile America's lot for resale to a new buyer who would assume the remaining payments on the existing contract at the same interest rate, provided that both Mobile America and Ford Credit approved the transfer. The original buyers, Miller and his wife, defaulted and voluntarily surrendered the mobile home and the trailer was returned to the Mobile America sales lot and placed on the market for a sale on the assumption basis under the second option referred to above. On June 11, 1974, the mobile home was sold to Clifford L. Flock and wife under a Transfer of Equity Agreement of that date whereby the Flocks assumed the unpaid balance under the original contract and agreed to pay the remaining installments. This Transfer of Equity Agreement was signed by the Millers as transferors and the Flocks as transferees and consented to by Mobile America and Ford Credit. The Flocks in turn subsequently defaulted, at which time the mobile home was returned

to the Mobile America sales lot and the contract held open for transfer on an assumption basis.

The Plaintiffs saw the mobile home on the sales lot of Mobile America and agreed to buy it by paying $751.00 in cash for the sales tax, license and title transfer, and by assuming the balance of the payments which were then due Ford Credit. They first had to sign a credit application form. Later, on December 18, 1974, after being informed that their credit was acceptable, they executed a Transfer of Equity Agreement, a consent and waiver form reciting where the home would be placed and that it would remain personal property, and a mobile home addendum to retail installment contract which identified certain personal property in the home as being a part of the retail installment contract and not subject to becoming a part of any real property. All of the above forms were supplied by Ford Credit for the use by Mobile America and, with the exception of the Transfer of Equity Agreement, were all filled in by Mobile America employees. The Transfer of Equity Agreement was filled in by Ford Credit and was then sent to Mobile America for execution by the Plaintiffs. In addition to the above instruments, there was the usual title application and the tax affidavit forms supplied by the State and filled out by Mobile America. The title work connected with the Blocker transfer was handled by Mobile America, and this included a repossession affidavit which was executed by Ford Credit at the request of Mobile America and which was used to complete the title transfer. The affidavit states that Ford Credit had repossessed the mobile home in question under the terms of its chattel mortgage.

One of the instruments used by Mobile America to secure the transfer of title to the Plaintiffs was a power of attorney executed by the Flocks in June, 1974, whereby Mobile America was empowered to apply for a certificate of title or to transfer title or equity to the mobile home in question. It is this instrument which Ford Credit claims made the transaction a sale between private individuals since Mobile America entered the picture only as an agent or attorney in fact for the previous owners, the Flocks.

However, additional facts are present that bear on this relation between Mobile America and the Plaintiffs. While Mobile America made no visible profit from the sale to the Plaintiffs, it was interested in disposing of the mobile home for the obvious reason that it passed on its own contractual obligation to Ford Credit to the new purchaser. Also, the mobile home was in an unsatisfactory condition as it had been stripped of many items of furniture and fixtures. In effecting the sale to the Plaintiffs, Mobile America agreed to and did furnish at its own expense two new air conditioners, a washer, a dryer, a refrigerator, a broiler pan for the stove, and new draperies. Because the Plaintiffs had their own furniture, Mobile America also installed a new freezer as a replacement for the missing furniture. It was these items that were listed on the mobile home addendum to retail installment contract previously referred to above, and this contract was executed by Mobile America as seller and by the Plaintiffs as buyers. Further, at the time of the sale, various repairs were agreed to be made by Mobile America and at that time Mobile America agreed to furnish to the Plaintiffs a "one-year warranty" on the home effective from the date that the home was installed in place. About ten days after the papers were signed, Mobile America delivered the mobile home. Sometime subsequent to the sale, the Blockers received their copy of the certificate of title to the mobile home showing them as owners and Mobile America as the previous owner with Ford Credit as lienholder. Thereafter, numerous problems developed with the mobile home and the Blockers complained to Mobile America. Mobile America sent representatives in an attempt to make the repairs but the repairs were unsatisfactory. Finally, on advice of counsel, the Blockers stopped making their payments, vacated the home, and the present suit was instituted in December, 1975.

The Transfer of Equity Agreement, the form filled in and provided by Ford Credit, is to the effect that the transferors sell and convey all of their interest in the property to the transferees who assume and agree to pay all of the transferors' obligations to Ford Credit under the described contract. The original retail installment contract dated December 26, 1973, is described; the original time balance of $26,614.08 is set forth; the unpaid balance of the obligation assumed is set forth as being $24,580.43; the annual percentage rate on the obligation assumed is stated to 11.41%; and the transferees agree to pay the amount financed in 133 monthly installments of $184.82 each. The Blockers as transferees executed the instrument in two separate places, but the instrument is not executed by the transferors. Mobile America Sales Corporation, as the original seller, executed a consent to the transfer on the form and in turn the consent of Ford Motor Credit Company is also reflected on the contract.

It was stipulated by the parties at the trial that this Transfer of Equity Agreement did not comply in at least one respect with the disclosure requirements of the Texas Consumer Credit Code applicable to retail installment transactions. Ford Credit's position is that the Blockers purchased the mobile home under the existing retail installment contract initially executed by and between Mobile America and the Millers, and assumed the outstanding balance and remaining payments at the same annual percentage rate; that Mobile America had no title or interest in the mobile home to convey to the Blockers and was acting only as agent for and on behalf of the previous owners, the Flocks, in handling the transfer to the Blockers; and that Chapter 7 of the Texas Consumer Credit Code is not applicable to an assumption purchase but only to a retail purchase from a retail seller.

Other than issues on attorney's fees, the case was submitted on one question inquiring of the jury if they found that Mobile America Sales Corporation, in handling the sale of the mobile home to John and Rosemary Blocker, acted as seller in its own behalf. To the question the jury answered

"It did." Thus, it appears that the case was tried on the premise that it was necessary for the Blockers to prove a retail sale from Mobile America to the Blockers in order for the transaction to qualify as a retail installment transaction subject to the requirements and prohibitions of Chapter 7 with the consequent penalties afforded by Chapter 8.

Ford Credit, by a series of points, asserts that as a matter of law the transaction was not a sale or a retail installment transaction as defined by Chapter 7 but was an assumption; that there was no evidence supporting the finding of the jury; and finally, that the finding was contrary to the great weight and preponderance of the evidence. To resolve these points, we must first examine the Statutes. Retail sales of various motor vehicles, including mobile homes, are governed by the Statute where there is a "retail seller" and a "retail buyer" as those terms are therein defined. On the other hand, the Statute is inapplicable to private transactions between individuals neither of whom is a "retail seller." A "retail buyer" is defined as meaning "a person who agrees to buy or buys a motor vehicle other than principally for the purpose of resale, from a retail seller in a retail installment transaction." Tex.Rev.Civ.Stat.Ann. art. 5069–7.-01(b). A "retail seller" is defined as "a person engaged in the business of selling motor vehicles to retail buyers in retail installment transactions." Tex.Rev.Civ. Stat.Ann. art. 5069–7.01(c). A "retail installment transaction" is defined in Sec. 7.01(d) as follows:

" 'Retail Installment Transaction' or 'Transaction' means any transaction as a result of which a retail buyer acquires a motor vehicle from a retail seller under a retail installment contract for a sum consisting of the cash sale price and other charges as limited by this Chapter and agrees with a retail seller to pay part or all of such sum in one or more deferred installments.  *  *  *"

That Section goes on to say that a retail installment "shall include every transaction wherein the promise or agreement to pay

the deferred balance of such sum is made by the retail buyer to the retail seller * *."

" 'Retail Installment Contract' or 'Contract' means a contract entered into in this State evidencing a retail installment transaction. * * * " Sec. 7.01(e).

In many ways the statutory coverage is not spelled out. That is true of the fact situation before us. However, Chapters 7 and 8 of the Texas Consumer Code were designed to protect buyers by preventing abusive and deceptive trade practices by both sellers and creditors of personal property and motor vehicles in ordinary credit transactions. To effect that purpose, the rule of strict construction applicable in the past to punitive statutes has been subordinated to the cardinal rule of construction that the statutes are to be liberally construed to effect the intention of the Legislature. To achieve that result, a strict duty to see that contracts comply with the statutory requirements and prohibitions has now been imposed on both the seller and the creditor in the ordinary credit transaction. Thus, the duty was imposed on the seller in *O. R. Mitchell Motors, Inc. v. Bell,* 528 S.W.2d 856 (Tex.Civ.App.—San Antonio 1974, writ ref'd n. r. e.), and on the creditor in *Southwestern Investment Company v. Mannix,* Tex., 557 S.W.2d 755 (1977).

Here, these Plaintiffs who meet the definition of "retail buyers" deal with Mobile America which meets the definition of a "retail seller" and acquire a motor vehicle from that retail seller by assuming the balance of an outstanding retail installment contract by executing a Transfer of Equity Agreement filled in and prepared by the creditor whereby those buyers agree to pay an interest charge in excess of ten percent. Those buyers qualify for the protection afforded by Chapter 7 and this transaction is within the definition of a "retail installment transaction." The fact that the buyer acquires a motor vehicle from a retail seller by promising to pay a sum consisting of a cash price plus finance charges in deferred installments brings the transaction under the Code.

The fact that the deferred installment equals the outstanding balance under some previous contract in no way exempts the transaction, neither does the fact that Mobile America was acting as agent or attorney in fact in conveying the interest of the Flocks to the Plaintiffs avoid the Chapter. Mobile America was also acting for itself as a retail seller and in the transaction was engaged in the business of selling motor vehicles to retail buyers in retail installment transactions. In reviewing the legal sufficiency points, we have considered only the evidence and inferences arising therefrom which support the jury's finding. In reviewing the contention that the finding was contrary to the great weight and preponderance of the evidence, we have considered all of the evidence and points 1 through 9 inclusive are overruled.

Ford Credit requested a special issue inquiring from a preponderance of the evidence if the transaction by which the Plaintiffs acquired the mobile home was an assumption or a retail installment transaction. The request was refused and error is assigned. As indicated, the facts were not disputed. Ford Credit on the last occasion had repossessed the trailer but had never foreclosed its security interest, and after the transaction was completed, the Plaintiffs had merely assumed the outstanding balance. As we have discussed, there was both a sale of the trailer and an assumption of the obligation; yet it was clearly a retail installment transaction within the definition where the creditor had the duty of complying with the requirements of Chapter 7. For breach of that duty, it became liable under the terms of Chapter 8. The issue was unnecessary and points 10 through 12 inclusive are overruled.

The next point is directed toward an alleged ambiguity in the jury's answer to Special Issue No. 1 which inquired if Mobile America, in handling the sale of the mobile home, acted as a seller in its own behalf. Here the jury answered "It did" and that answer is unequivocal. If there was any ambiguity, it would have to be found in the

form in which the issue was submitted and not in the jury's answer. Ford Credit did not object to the form of the issue at trial and therefore has waived any possible objection. Tex.R.Civ.P. 279. As previously pointed out, the case was tried on the premise that it was necessary for the Plaintiffs to prove a retail sale from Mobile America in order for the transaction to qualify as a retail installment transaction. That theory was submitted by the issue and there was no objection from either side. The point is overruled.

By its next three points, Ford Credit maintains trial Court error in granting the partial summary judgment because the Transfer of Equity Agreement violated the Federal Truth-in-Lending Act and Federal Reserve Regulation Z. Ford Credit asserts that as a matter of law the Transfer of Equity Agreement complied with the Act and the Regulation, or that at least a genuine issue of material fact was presented by the pleadings and summary judgment evidence.

Both parties agree that the transaction is a consumer credit transaction subject to the provisions of the Federal Truth-in-Lending Act and Federal Reserve Regulation Z, and that Regulation Z requires that certain disclosures be made on assumptions such as presented here.

■ In its order granting the partial summary judgment, the trial Court found that the Plaintiffs were entitled to a judgment as a matter of law for the Defendant's failure to disclose the "total of payments" as required by Federal Reserve Regulation Z. 12 C.F.R. 226.1, et seq. The disclosures that are required to be made are set forth in Section 226.807(b)(1) of the Regulation which provides as follows:

"(1) If the finance charge originally imposed on the existing evidence of debt was an add-on or discount type finance charge, the creditor need only disclose:

"(i) The unpaid balance of the obligation assumed;

"(ii) The total amount of the charges imposed by the creditor, individually itemized, in connection with the assumption;

"(iii) The number, amount, and due dates of remaining payments to be made after assumption, the total of such payments, and any other applicable information required under Sec. 226.8(b)(3) * *."

Section 226.8(b)(3) is to the following effect:

"The number, amount, and due dates or periods of payments scheduled to repay the indebtedness and * * * the sum of such payments using the term, 'total of payments.' * * *"

The part of the Transfer of Equity Agreement under consideration is as follows:

"DETAILS OF TRANSACTION

"1. Unpaid Balance of obligation assumed—AMOUNT FINANCED .... $24,580.43

"2. Transfer Fee (Paid in Cash Herewith) ......................... $ 25.00

"3. ANNUAL PERCENTAGE RATE in obligation assumed 11.41%

Transferee agrees to pay the Amount Financed, (a) in 133 monthly instalments of $184.82 each * * * all payable the like date of each successive month commencing Jan. 9, 1975 * * *"

From an examination of the disclosures made, it appears that there was a failure to use the term "total of payments," in a violation of the Federal Truth-in-Lending Act and Federal Reserve Regulation Z has been shown. While the above involves considerable nitpicking, that has been mandated as the order of the day. *Pennino v. Morris Kirschman and Company*, 526 F.2d 367 at 370 (5th Cir. 1976). Points of Error Nos. 14, 15 and 16 are overruled.

■ Ford Credit's last two points complain of the trial Court's action in declining to grant Ford Credit a judgment on its counterclaim. Ford Credit filed a cross-action against the Plaintiffs under the terms of the retail installment contract of December, 1973, which had been assigned to it at that time by Mobile America. The terms of the retail installment contract had been assumed by the Plaintiffs according to the terms of the Transfer of Equity Agreement. Ford Credit alleged that it was ac-

celerating the maturity of the contract because of the default in the payments by the Plaintiffs. However, according to the stipulation of the parties made at the trial, all payments due under the contract had been made by Mobile America and had been received and accepted by Ford Credit up until the time of trial. No basis existed by which Ford Credit could accelerate the maturity of the contract because of the failure of payments. The action of the trial Court in refusing to accelerate the contract and in refusing to enter judgment on the cross-action was correct. *Cook v. Service Finance Corporation,* 143 Tex. 211, 183 S.W.2d 436 (1944).

We have considered all of the Appellant's points and they are overruled. The judgment of the trial Court is affirmed.