Emilio ESPINOZA et ux., Appellants,

v.

VICTORIA BANK & TRUST COMPANY, Appellee.

No. 1292.

Court of Civil Appeals of Texas, Corpus Christi.

Oct. 19, 1978.

Rehearing Denied Nov. 9, 1978.

Don Krause, San Antonio, for appellants.
Robert P. Houston, Victoria, for appellee.

## OPINION

BISSETT, Justice.

This is a summary judgment case. The dispute arose out of a credit transaction involving a mobile home. Emilio Espinoza and wife, Viola Espinoza, hereinafter referred to as the "Espinozas," brought suit

against the Victoria Bank & Trust Company, hereinafter called the "Bank," to recover damages under the Deceptive Trade Practices Act, Tex.Bus. & Comm.Code Ann., §§ 17.41–63, and to recover statutory penalties and attorney's fees for several violations of the Texas Consumer Credit Code, Tex.Rev.Civ.Stat.Ann. art. 5069–1.01, et seq., hereinafter referred to as either the "Credit Code" or the "Code." With respect to the action brought under the Credit Code, the Espinozas first alleged that the transaction in question constituted an installment loan as defined by Chapter Four and that such loan was usurious. In the alternative, they alleged that the transaction was a retail installment sale within the purview of Chapter Seven. The Bank filed what it denominated a "cross action" and what the judgment described as a "counterclaim," whereby it sought to recover the balance due on a note which the Espinozas had executed in connection with their purchase of the mobile home.

The trial court denied the Espinozas' motion for summary judgment on their Credit Code claims, granted the Bank's motion for summary judgment concerning such claims and also granted its motion for summary judgment on its counterclaim; and, after a hearing before the Court where evidence was presented, found that the Bank was entitled to attorney's fees "for the prosecution of its counterclaim." After a jury trial concerning the action brought under the Deceptive Trade Practices Act, the trial court instructed a verdict in favor of the Bank. The trial court then decreed:

> "[t]hat Plaintiffs take nothing by their suit and that Defendant be awarded judgment against the Plaintiffs in the amount of $10,662.30, plus a reasonable attorney's fee in the amount of $3,600.00."

It was further ordered that "Defendant's lien on the mobile home owned by the Plaintiffs is foreclosed . . ."

The Espinozas have not appealed from that portion of the judgment which granted the Bank's motion for an instructed verdict and resulted in a take nothing judgment on

their suit under the Deceptive Trade Practices Act. They have, however, appealed from the remaining portions of the judgment.

■ The transcript shows only two motions for summary judgment; one was filed by the Espinozas on their Credit Code claims, and the other was filed by the Bank on its counterclaim. However, the judgment recites, in part, that "the Court considered Defendant's Motion for Summary Judgment as to the Plaintiffs' claim that it had violated the Texas Consumer Credit Code . . . and . . . considering the pleadings, depositions, affidavits, exhibits and interrogatories on file herein, the Court is of the opinion that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law, and therefore Defendant's Motions for Summary Judgment are in all things, Granted." The parties agree that the Bank did file such a motion. The Espinozas, appellants herein, present two points of error (their second and fourth points), wherein they assert that the trial court erred in granting the Bank summary judgment against them on their asserted Credit Code claims. The Bank, appellee herein, says in its brief: "[t]he Trial Court properly overruled Appellants' Motion for Summary Judgment on this point and granted that of the Appellee." We consider that the judgment with respect to the Credit Code claims is final and appealable under the rule announced in *Tobin v. Garcia*, 59 Tex. 58, 316 S.W.2d 396 (1958).

■ The true purpose of summary judgments is the elimination of patently unmeritorious claims or untenable defenses. *Swilley v. Hughes*, 488 S.W.2d 64, 68 (Tex. Sup.1972). Thus, summary judgment should be granted, and if granted, should be affirmed, only if the record establishes the right of the movant to judgment as a matter of law in the absence of any genuine issues of material fact. *Farley v. Prudential Insurance Company*, 480 S.W.2d 176 (Tex.Sup.1972); *Collins v. New*, 558 S.W.2d 108, 109 (Tex.Civ.App.—Corpus Christi 1977, no writ). The burden of proof is on

the movant for summary judgment, and all doubts as to the existence of a genuine issue of material fact are resolved against him. *Parrott v. Garcia*, 436 S.W.2d 897 (Tex.Sup.1969).

The evidence herein discussed with respect to the denying of the Espinozas' motion for summary judgment and the granting of the Bank's motion therefor means proper "summary judgment" evidence.

The Espinozas purchased from Padre Mobile Homes, hereinafter referred to as the "Dealer," in Corpus Christi, Texas, a used mobile home which had previously been owned by one Richard Palmer, subject to a security interest held by the Bank. Palmer defaulted on his payments to the Bank, and the mobile home was repossessed by Jack H. Wigginton and Associates, Inc., hereinafter referred to as "Wigginton." The mobile home was delivered by Wigginton to the Dealer's lot in Corpus Christi where it was put up for sale. The Espinozas later visited the Dealer's lot, and decided to purchase the mobile home. They executed a "purchase agreement" on April 21, 1975, whereby they agreed to buy, and the Dealer agreed to sell, the mobile home in question. On the face of the agreement in small type near the bottom of the page is the statement:

"Title to the within described unit passes as of the date of signing of the retail installment or security agreement by the purchasers even though physical delivery may not be made until a later date."

The price of the mobile home, according to the purchase agreement, is shown to be $8,834.80. The purchase agreement recites a cash down payment of $556.04, leaving an unpaid balance on the sale price of $8,278.76. Next, comprehensive insurance coverage for a term of at least thirty-six months, at a premium cost of $593.00, is listed, together with coverage of personal effects for $3,500.00. No premium is shown for the latter coverage. Immediately below the itemization of insurance coverage is a box labeled "please purchase the coverages checked above." The box was checked. The amount financed is stated to be

$9,018.00. The finance charge for the sale is then shown to be $8,114.40. The annual interest rate is stated to be 14.5%. The total amount payable ($17,132.40) is to be paid in 120 monthly installments of $142.77 each. The finance charge includes the $593.00 insurance premium. Neither Mr. nor Mrs. Espinoza read any provision of the "purchase agreement" at the time it was signed.

In addition to the "purchase agreement" the Espinozas signed two other documents on April 21, 1975. First, they signed an application for credit to finance their purchase of the mobile home. Second, they made an application to the Mobile County Mutual Insurance Company for the insurance on the mobile home. Such application requested the following: 1) comprehensive insurance at a premium of $548.00; 2) personal effects insurance at a premium of $15.00; 3) VSI (vendor's single interest) insurance at a premium of $30.00. While it is undisputed that the policy was duly issued, it is not in evidence.

After signing the "purchase agreement," the application for credit, and the application for insurance, and making their down payment on the mobile home, the Espinozas understood that the Dealer would attempt to find a lending institution which was willing to finance their purchase of the mobile home. They did not, at that time, know that the Bank would finance their purchase. A few days later, a salesman representing the Dealer called them and told them that financing had been obtained from the Bank. The Espinozas then executed a document entitled "security agreement, note and installment contract," hereinafter referred to as the "security agreement." Under its provisions, the Espinozas agreed to pay to the order of the "LENDER" the sum of $17,132.40 in 120 successive monthly installments of $142.77 each, commencing June 4, 1975. Included therein is a finance charge of $8,114.40. The document states on its face that the "ANNUAL PERCENTAGE RATE" is 14.5% per annum. Also included therein, is a charge of $593.00, which is described therein as the premium for "com-

prehensive insurance for a term of at least 36 months if obtained through LENDER." The insurance charge (premium) is shown as being "included in the amount financed."

After the Espinozas signed the "security agreement," all papers incidental to the transaction (purchase agreement, insurance application, credit application and security agreement) were delivered by the Dealer to Wigginton, who, in turn, forwarded them to the Bank, along with a receipt for title application and disbursement record. This was done about May 15, 1975.

At all times pertinent to this appeal, there was outstanding an agreement between Wigginton and the Bank. According to the agreement, Wigginton was an independent contractor in the business of mobile home servicing. Wigginton promised to provide certain services as well as obtain indemnity insurance for the Bank against any credit losses caused by buyer defaults on outstanding mobile home loans. Among its more important services, Wigginton promised to solicit indirect "mobile home installment loan contracts" by approaching various mobile home dealers. Additionally, it was required to handle all aspects of mobile home repossessions for the Bank.

The procedure to be followed by Wigginton in repossessing mobile homes was spelled out in its agreement with the Bank. After receiving written authorization from the Bank, Wigginton would physically repossess a unit and deliver it to an approved retail dealer for resale. Should such resale involve an indirect loan, Wigginton promised to supply all necessary forms. According to the agreement, it was actually the Dealer who was to initiate such a loan by furnishing the Bank with a credit application. If the Bank approved the loan, the dealer would then provide the Bank with all the documents required by Wigginton's "underwriting guidelines." The Bank would then review the correspondence and send it on to Wigginton, which would then issue a "default insurance certificate" on the particular loan involved. One reason for this procedure was to guarantee Wigginton that the proper property insurance had been written on the mobile home being purchased. Thus, actual procurement of property insurance in some manner was a necessary precondition to actualization of the indemnity bond meant to protect the Bank from credit losses. It was also, however, the policy of the Bank in this case to require insurance for the collateral.

In this case the Bank sent the Espinozas a payment booklet after their credit had been approved and the "security agreement" had been executed. Upon receipt of the payment booklet, payment to the Bank was commenced by the plaintiffs. Payment on the mobile home continued until the Espinozas allegedly experienced difficulties with their home when, in July or August, 1976, they stopped paying on the note. This suit was filed thereafter.

In their first two points of error, the Espinozas contend that the Bank made them an installment loan, that the interest charged was usurious as a matter of law under Chapter Four of the Credit Code; and, consequently, it was reversible error to deny their motion for summary judgment upon the Credit Code claim asserted by them and to grant the Bank summary judgment thereon. As will be developed in detail, the transaction in question did not constitute an installment loan contract within the purview of Chapter Four of the Credit Code.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.02, Chapter One of the Credit Code, limits the legal rate of interest to 10% per annum "unless otherwise authorized by law." Under Chapter Four of the Code, Tex.Rev.Civ. Stat.Ann. art. 5069–4.01, interest at more than 10% per annum may be legally charged under certain circumstances. The statute places a limit on the amount of interest to be charged at "Eight Dollars per One Hundred Dollars per annum for the full term of the loan contract." Therefore, under the formula provided by the statute, if there was an installment loan contract in this case, the Bank, as asserted by the Espinozas, charged the latter about $900.00 interest above the amount allowed by the statute. But, in order to hold that the

contract was usurious on its face as a matter of law under Chapter Four of the Code, we would be required to hold that the transaction involved is an installment loan contract. This, we refuse to do.

Neither of the parties have cited a Texas case which assertedly controls the determination of whether the transaction was, as contended by the Espinozas, an installment loan contract within the provisions of Chapter Four of the Credit Code; or, whether such transaction, as contended by the Bank, was a retail installment sales contract under Chapter Seven of the Code.

█ The term "loan" is not defined in Chapter Four of the Credit Code. However, Section 7.09 of Chapter Seven of the Code provides that none of the provisions governing motor vehicle installment sales "shall affect or apply to any loans or to the business of making loans." See Tex.Rev. Civ.Stat.Ann. art. 5069–7.09 (1971). It is also provided by the statute that none of the provisions of the loan or interest statutes shall "affect of apply to any retail installment transaction." We construe this to mean that the legislature intended for installment loans and retail installment sales to be treated as mutually exclusive concepts. Otherwise, a transaction which happened to resemble both in different aspects might be subject to two conflicting statutory standards. Thus, a transaction whereby a person acquires a mobile home where the payment of part of the consideration is financed must be treated as either an installment loan or as a motor vehicle installment sale, but not both.

We consider *Manning v. Princeton Consumer Discount Company, Inc.*, 390 F.Supp. 320 (E.D.Pa.1975), aff'd, 533 F.2d 102 (3rd Cir. 1976), to be persuasive in determining whether or not the transaction amounted to an installment loan. There, the plaintiff alleged that the defendant had violated the Federal Truth-in-Lending Act, 15 U.S.C.A. §§ 1601–1681 (1974), by treating the credit sale of a car as if it were a loan. After plaintiff had agreed to buy a car from the defendant, she made a down payment and was promised that financing would be obtained. The defendant car dealer submitted credit information on the plaintiff to a lending institution, which the plaintiff had never heard of nor done business with. The dealer, however, had a continuing relationship with the finance company. About a week after the plaintiff made her down payment, the dealer telephoned the plaintiff and explained that financing had been obtained. He took the plaintiff to the finance company to fill out a "loan" contract. Plaintiff signed the "loan" agreement and was issued a draft which she immediately endorsed over to the dealer. The "loan" was for the exact amount of the unpaid balance on the car. The issue before the court was whether the transaction was a loan for the purposes of disclosure requirements in the Truth-in-Lending Act. If it was, the disclosure requirements were less strict than if it were a consumer credit sale. 15 U.S.C.A. § 1639 (1974), which set requirements for disclosure in loan transactions, applied to "any creditor making a consumer loan or otherwise extending credit in a transaction which is neither a consumer credit sale nor under an open end consumer credit plan." A "credit sale" is defined in 15 U.S.C.A. § 1602 (1974) as "any sale with respect to which credit is extended or arranged by the seller." The issue for the Court, therefore, was whether the dealer had "extended or arranged" for credit to finance the plaintiff's purchase of the car. The court held that the dealer had arranged for such credit and, therefore, the transaction was a credit sale rather than a loan. The same reasoning applies to the case now before us on appeal.

█ We acknowledge that there are some factual and legal distinctions between *Manning* and the case at bar, for in *Manning*, the dealer and finance company had a continuous and ongoing relationship, and the defendant was the dealer rather than the lending institution. Moreover, *Manning* dealt with federal law in general and the Truth-in-Lending Act in particular. Here, there was no continuous and ongoing contractual relationship between the Dealer and the Bank prior to the Espinoza transac-

tion, but we believe that *Manning* is relevant in that it points the way to what we think is a satisfactory legal test for determining whether or not a transaction should be treated under the Credit Code as an installment loan where the purchaser does not arrange for his own credit. Comporting with the rule that a court should consider the substance of a transaction rather than its mere form, we hold that, regardless of the labels the parties place on a transaction, or the forms that they use, where the dealer is substantively involved in arranging for the buyer's credit through a lending institution the transaction is not an installment loan contract but rather a retail installment sales contract.

In the instant case, the "security agreement," standing alone, could be literally read as either an installment loan contract or a retail installment sales contract. The frontside of the document is consistent in its use of the terms "borrower" and "lender." The backside of the document is equally consistent in its use of the terms "buyer" and "seller." But after consideration of the "purchase agreement," which, while not executed at exactly the same time as the "security agreement," was executed as part of essentially one transaction, the latter document takes on the aspects of a retail installment sales contract.

Reading the two documents as different, yet related, expressions affecting the same transaction, while also considering the attendant circumstances, we conclude that the substance of this transaction is more in the nature of an installment sale, rather than an installment loan. The Espinozas did not initially seek out the Bank to loan them the money with which to buy a mobile home. Instead they sought out a dealer in mobile homes. When they found a mobile home which suited them, they then relied on the dealer to obtain financing for their purchase of the same. The Dealer, in turn, obtained financing from the Bank in a manner that was contemplated by the agreement between the Bank and Wigginton. In effect, this entire transaction amounted to an "indirect loan" as defined in Wigginton's service agreement with the Bank and contemplated by the Bank's policy.

The Espinozas, besides zeroing in on the form of the "security agreement," also place undue stress on the nature of the "purchase agreement." They contend that the "purchase agreement" was not meant to be an installment sales contract because it essentially promises the Dealer nothing save $500.00 liquidated damages in the event they breach their promise to purchase the home. We find nothing extraordinary about such an agreement, particularly in light of what was contemplated by the Dealer, who fully expected that the Espinozas' obligation to pay for the mobile home would eventually end up in the Bank's hands.

The record shows that the execution of the "purchase agreement" and the "security agreement" essentially constituted a single transaction which was not completed until the latter document was signed by the Espinozas. We hold that the transaction amounted to a retail installment sales contract under Chapter Seven of the Credit Code, and not an installment loan contract under Chapter Four of the Code. Therefore, the interest charged was not, and could not, be usurious as being in violation of Chapter Four. The Espinozas' first and second points of error are overruled.

The Espinozas, by their third and fourth points of error, contend that if the transaction here involved was not an installment loan contract under Chapter Four of the Credit Code, then it was a motor vehicle installment sale under Chapter Seven of the Code. They assert that the trial court erred in denying their motion for summary judgment, and in granting the Bank's motion concerning their claim, because the Bank "violated Chapter Seven of the Texas Consumer Code as a matter of law" in that the Bank failed to make certain required disclosures to them.

Having held that the true character of the transaction in question was a motor vehicle sale under a retail installment contract, we first determine whether or not the

Bank was a "retail seller" or "holder" under Chapter Seven of the Code. The Espinozas' claim that it was, while the Bank asserts that it was not because it is conclusively established by the evidence that only the Dealer (Padre Mobile Homes) was the retail seller.

It is undisputed that the Espinozas were "retail buyers" of the mobile home. Art. 5069–7.01(c) of the Credit Code defines a "retail seller" as:

". . . a person engaged in the business of selling motor vehicles to retail buyers in retail installment transactions."

Art. 5069–7.01(d), defines "retail installment transaction" as:

". . . any transaction as a result of which a retail buyer acquires a motor vehicle from a retail seller under a retail installment contract for a sum consisting of the cash sales price and other charges as limited by this Chapter and agrees with a retail seller to pay part or all of such sum in one or more deferred installments. The term shall include every transaction wherein the promise or agreement to pay the deferred balance of such sum is made by the retail buyer . ."

Additionally, art. 5069–7.01(j) defines "holder" as:

". . . the retail seller of the motor vehicle or assignee if the retail installment contract or the outstanding balance thereunder is sold or otherwise transferred."

The Bank, in its first amended original answer, its live pleading, stated:

". . . the entire transaction involved the sale of a mobile home pursuant to a contract entered into by and between the PLAINTIFF and PADRE MOBILE HOMES, *and the subsequent assignment of that contract to DEFENDANT . ."* (Emphasis supplied).

In its counterclaim, the Bank averred:

"DEFENDANT is the *holder* of the RIGHT TO RECEIVE PAYMENTS on an Installment Sale Contract pursuant to the terms of a series of transactions (the sequence of which was described) . ."
(Emphasis supplied).

The affidavit of Mr. Ed Branton, Vice-President of the Bank, which was attached to the Bank's reply to the Espinozas' motion for summary judgment, stated:

"The mobile home which was ultimately sold to MR. and MRS. ESPINOZA was owned at the time of sale by VICTORIA BANK & TRUST COMPANY, having been repossessed for VICTORIA BANK & TRUST COMPANY by JACK H. WIGGINTON and ASSOCIATES, INC. . ."

Mr. Branton also stated in his affidavit:

". . . the Bank treated this entire transaction as a vehicle installment sales contract, the contract having been *assigned* to the Bank . ." (Emphasis supplied).

Mr. Branton concluded his affidavit with the statement:

"The bank in the ESPINOZA instance was both owner/retail seller and assignee of the contract of sale prepared and assigned by PADRE MOBILE HOMES."

In view of the admissions made by the Bank in its pleadings, of the statements made by Mr. Branton in his affidavit, which comprises part of the summary judgment evidence in this case, and other summary judgment evidence hereinbefore summarized in our disposition of the Espinozas' first and second points, we hold that it was conclusively established that the Bank: 1) was the owner of the mobile home at the time it was sold to the Espinozas; 2) was a "retail seller" as that term is defined in Chapter Seven of the Code; 3) was a "holder" under the statutory definition; and 4) was the "assignee" of the installment sales contract. Furthermore, in a manner of speaking, all rights which Padre Mobile Homes, the Dealer, may have acquired pursuant to the execution of the "purchase agreement" were "otherwise transferred" to the Bank when the Espinozas executed the "security agreement" in the Bank's favor under the circumstances noted. Unquestionably, the transaction constituted a retail installment sales contract between

the Espinozas as "retail buyers" and the Bank as either a "retail seller" or a "holder."

■ We now turn our attention to whether or not the Bank violated any of the provisions of Chapter Seven of the Credit Code. The Espinozas first contend that the Bank failed to disclose to them at the time the transaction was made that the required comprehensive insurance was procured at a rate "not fixed or approved by the State Board of Insurance."

Tex.Rev.Civ.Stat.Ann. art. 5069–7.06(2) and (3), in relevant part, provide:

"(2) A seller or holder may, in addition, request or require a buyer to insure tangible personal property involved in such a contract, made under authority of this Chapter, and include the cost of such insurance as a separate charge in such contract.  .  .  . "

(3) When insurance is required in connection with such a contract or agreement made under this Chapter, the seller or holder shall furnish the borrower a statement which shall clearly and conspicuously state that insurance is requested or required in connection with the contract, and that the buyer shall have the option of furnishing the required insurance either through existing policies of insurance owned or controlled by him or of procuring and furnishing equivalent insurance coverages through any insurance company authorized to transact business in Texas. In addition when any requested or required insurance is sold or procured by the seller or holder at a premium or rate of charge not fixed or approved by the State Board of Insurance, the seller or holder shall include such fact in the foregoing statement  .  .  . "

It is undisputed that property insurance was required in this case. It is conclusively established by the evidence that the insurance required by both the "purchase agreement" and the "security agreement" was issued by Mobile County Mutual Insurance Company (Mobile), for a three-year period at a premium cost of $593.00. It is also undisputed that the above premium was not fixed or approved by the State Board of Insurance. It is further undisputed that this fact was not disclosed to the Espinozas by the Bank or anyone else. It is conclusively established by the evidence that the Espinozas, on the face of the "purchase agreement," instructed Padre Mobile Homes, the Dealer, to "purchase the coverages checked above." Both the "purchase agreement" and the "security agreement" disclosed that the $593.00 premium was to be financed.

The "security agreement," in pertinent part, provided:

"Comprehensive insurance coverage for term of at least 36 months payable to BORROWER, LENDER, LENDER'S assigns, as interest may appear, is required for this loan; premium $593.00 if obtained through lender.

BORROWER SHALL HAVE THE OPTION OF FURNISHING SAID INSURANCE EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR OF PROCURING AND FURNISHING EQUIVALENT COVERAGE THROUGH ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. INSURANCE COVERAGE TO BE FURNISHED BY

☐ Lender  ☐ BORROWER"  (The box labeled "Borrower" was checked.)

It is further undisputed that the Bank financed the premium that was paid to Mobile County Mutual Insurance Company. Mr. Branton stated in his deposition:

"Q If you will look at the security agreement, note and installment contract, does it also show a charge for insurance coverage for property insurance?

A Yes, it does.

Q Five Hundred and Ninety-three dollars?

A That's correct.

Q Okay. So Victoria Bank & Trust Company financed the purchase of the property insurance?

A That's correct.

Q That is, part of the payment made by Mr. Espinoza to the Victoria Bank & Trust Company went to pay the premiums of this insurance?

A That's correct."

Regarding property insurance on the mobile home, two policies are involved. The first policy was issued by Mobile concurrently with the making of the retail installment contract. The second policy was issued by Foremost Mobile Home Insurance Co. (Foremost) some six months after the execution of the contract when Mobile went bankrupt. In view of our holding that the Bank failed to make required statutory disclosures with respect to the insurance provided by Mobile, it is not necessary that we consider the Espinozas' claim that the Bank also failed to make required statutory disclosures as to the insurance provided by Foremost.

We believe that *Southwestern Investment Co. v. Mannix,* 557 S.W.2d 755 (Tex. Sup.1977), is controlling of the issue concerning whether the Bank owed a duty to the Espinozas to disclose to them that the premiums charged by Mobile were not fixed or approved by the State Board of Insurance. This is so, even though the claims there involved were claims under Chapter Six of the Code rather than claims under Chapter Seven.

In *Mannix,* the Court distinguishes between "seller-procured insurance" and "buyer-procured insurance" in these words:

"... However, this court construes the term 'seller-procured insurance' to include any insurance coverage whereby the seller becomes involved in the insurance acquisition process or directly or indirectly benefits from such insurance coverage. This involvement may be accomplished by actual sales of insurance policies, referrals to insurance agencies, receipts of direct or hidden commissions, financings of insurance purchases from other sources, or by other similar devices. Only that insurance obtained totally independent of the seller and from which the seller will obtain no direct or indirect benefit from the procuring of the required insurance shall be considered 'buyer-provided.' "

The Supreme Court further noted that "seller" and "seller-procured" includes "holder" and "holder-procured." See also *Ford Motor Credit Co. v. Blocker,* 558 S.W.2d 493 (Tex.Civ.App.—El Paso, 1977, writ ref'd n.r.e.); *O. R. Mitchell Motors, Inc. v. Bell,* 528 S.W.2d 856 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.).

Under the evidence, there is no question but that the Bank was either a "seller" or a "holder" of the contract in question. It is conclusively established that the Bank financed the purchase of the required property insurance on the mobile home with Mobile, and thereby not only became "involved in the insurance acquisition process," but also benefitted financially from such insurance coverage by receiving interest on the amount of the premiums financed by it. The insurance obtained from Mobile was not obtained "totally independent of the seller" and from which the seller would obtain no direct or indirect benefit from the procuring of the required insurance. The "security agreement" required the "Buyer" to pay for all insurance premiums regardless of whether the pertinent policy was procured by the "Seller" or by the "Buyer." The fact that the Mobile insurance policy was written pursuant to an application made by the Espinozas does not, of itself, make such insurance "buyer-procured" under the definition of that term set out in *Mannix.*

Applying the very broad rule announced in *Mannix* to this case, we have no choice but to hold that the Bank was under a duty to disclose to the Espinozas that the premiums charged by Mobile, paid by the Bank to Mobile, and financed by the Bank, were not fixed or approved by the State Board of Insurance. Since it did not make such a disclosure, the Bank is required to pay to the Espinozas the statutory penalties imposed by Tex.Rev.Civ.Stat.Ann. art. 5069–8.01, which reads:

"Any person who violates this Subtitle by contracting for, charging or receiving in-

terest, time price differential or other charges which are greater than the amount authorized by this Subtitle, or by failing to perform any duty specifically imposed on him by any provision of this Subtitle, shall forfeit to the obligor twice the amount of interest or time price differential and default and deferment charges contracted for, charged or received, and reasonable attorneys' fees fixed by the court, provided that there shall be no penalty for a violation which results from an accidental and bona fide error."

There is no pleading or summary judgment proof that the Bank's violation of the disclosure requirement relating to the Mobile Insurance premium resulted from "an accidental or bona fide error."

We do not deem it necessary to determine whether the remaining alleged violations of the required disclosures constituted violations of the statute. The Espinozas' third and fourth points are sustained.

The Espinozas, by their fifth point of error, contend that the trial court erred in granting summary judgment for the Bank on its counterclaim for two reasons. First, they argue that the Bank did not have a claim to any interest or time-price differential because of its violations of the Credit Code. In this regard, the Espinozas cite us to the recent Supreme Court decisions in *Wall v. East Texas Teachers Credit Union,* 533 S.W.2d 918 (Tex.Sup.1976), and *First State Bank of Bedford v. Miller,* 563 S.W.2d 572 (Tex.Sup.1978). These cases are not in point. They dealt with usurious interest, and held that a lender cannot recover interest under the contract when the interest rate charged is usurious. The rate of interest charged by the Bank is not usurious.

Second, they argue that the Bank failed to prove proper acceleration of the maturity of the contract as an essential element of its claim. Specifically, they say that the Bank failed to give them any notice of its intent to accelerate the maturity of the note. The note and security agreement upon which the Bank's counterclaim is based contains a standard optional accelera-

tion clause which provides that "LENDER shall have the right at LENDER'S option to: . . . accelerate the maturity of the installments . . . ."

The Espinozas did not plead as an affirmative defense that the Bank did not give them any notice of its intent to accelerate the maturity of the note. That defense was not tried by consent, and cannot be urged for the first time on appeal. In that state of the record, we hold that such contended defense has been waived. See *Smith v. Davis,* 453 S.W.2d 340, 346 (Tex. Civ.App.—Fort Worth 1970, writ ref'd n.r. e.); *Kyle v. Commercial Credit Co., Inc.,* 152 S.W.2d 465 (Tex.Civ.App.—El Paso 1941, dism'd jmt. cor.); *Sylvester v. Watkins,* 538 S.W.2d 827 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.); *Gresham v. McElroy,* 309 S.W.2d 84 (Tex.Civ.App.—Houston 1958, no writ).

*Purnell v. Follett,* 555 S.W.2d 761 (Tex. Civ.App.—Houston [14th Dist.] 1977, no writ), relied on by the Espinozas, is not in point. That case involved a suit to set aside a trustee's sale under a deed of trust where it was alleged that there had not been proper notice of intent to accelerate before the trustee's sale. The Bank's action in the case at bar, however, deals with a suit on the note, which is materially different from a suit to set aside a trustee's sale.

There is another aspect of the case which should be mentioned. The Bank, in its motion for summary judgment on its counterclaim, did not attach the original or a certified copy of the note as an exhibit to any pleading, nor was such original or certified copy attached as an exhibit to any document constituting summary proof. See *Texas Nat. Corp. v. United Systems International, Inc.,* 493 S.W.2d 738 (Tex.Sup.1973); *Perkins v. Crittenden,* 462 S.W.2d 565 (Tex. Sup.1970). However, the Espinozas did not complain on that ground. Since the error did not constitute fundamental error, it cannot now be raised in this Court, and we cannot reverse the trial court's judgment because of such failure by the Bank. See *Southwestern Fire & Casualty Company v.*

*Larue*, 367 S.W.2d 162 (Tex.Sup.1963); *Perkins v. Crittenden,* supra.

The Espinozas' fifth point is without merit. Accordingly, it is overruled.

The Espinozas, in their sixth point of error, complain that the award of $3,600.00 as attorney's fees is excessive. We agree. The trial court awarded such attorney's fees "as a reasonable attorney fee for the prosecution of its counterclaim."

Contained in the "security agreement" is a boiler-plate provision that, in the event of default on the note, borrower agrees to pay the lender reasonable attorney's fees. The trial court, after ruling on the parties' motions for summary judgment, heard evidence on the matter of attorneys' fees incurred by the defendant.

The Bank's expert witness relating to attorney's fees testified that in his opinion as an attorney, the time spent in defending the Espinozas' suit was necessary "to the counterclaim"; that 100 to 120 hours were reasonably required to prepare for the defense of the Espinozas' suit and for the "prosecution" of the Bank's counterclaim; that a reasonable fee for such services would be $40.00 per hour for "preparation," and $50.00 per hour "for the trial"; and that taking into consideration the "complexities of this particular case," $4,800.00 would be a reasonable fee "for the prosecution of the counterclaim and the defense that was necessarily required under the plaintiff's (sic) cross-action in this case."

The attorney representing the Bank testified on direct examination that he spent 120 hours on the case. On cross examination, he stated that the actual time spent by him in drafting the counterclaim, and in arguing the same to the trial court was about 4 hours.

■■■■ In reviewing the trial court's action, we recognize that allowance of attorney's fees rests in the sound discretion of the trial court, and its judgment will not be reversed without a clear showing that the trial court abused its discretion. *Reintsma v. Greater Austin Apt. Maintenance,* 549 S.W.2d 434 (Tex.Civ.App.—Austin 1977,

writ dism'd w.o.j.). The range of what is reasonable is wide, *Hirsch v. Dearing*, 151 S.W.2d 949, 951 (Tex.Civ.App.—Galveston 1941, no writ), and this Court cannot set aside an award merely because it would have allowed more or less. However, we do have authority, by examining the entire record, to determine whether a particular award was excessive, to draw on our own knowledge as judges and lawyers, and to determine the matter in light of the testimony, the record, and the amount in controversy. *Southland Life Insurance Co. v. Norton,* 5 S.W.2d 767, 769 (Tex.Comm'n App.1928, opinion approved).

■■■■ Attorney's fees are not recoverable in tort or contract actions unless provided for by statute or by agreement between the litigants. *New Amsterdam Casualty Company v. Texas Industries, Inc.,* 414 S.W.2d 914 (Tex.Sup.1967). In the instant case, the law makes no provision for the recovery of attorney's fees in defending the type of suit brought by the Espinozas. Here, unquestionably the award of $3,600.00 for attorney's fees stems from evidence that the attorney's time was spent representing the Bank in the action brought by the Espinozas, as well as in representing the Bank on its counterclaim. Moreover, if the award is limited to legal services rendered on the counterclaim, as so stated in the judgment, the award of $3,600.00 is grossly excessive and constitutes an abuse of discretion. The Espinozas' sixth point is sustained.

The amount of the interest or time-price differential is $8,114.40; the note was payable in 120 monthly installments of $142.77 each. The "security agreement" provides for a default charge "in an amount not to exceed five percent of each installment or FIVE DOLLARS, whichever is less." Applying the penalty provisions of Tex.Rev. Civ.Stat.Ann. art. 5069–8.01 to the Credit Code action, the Espinozas are entitled to recover twice the sum of $8,114.40, and the sum of $1,200.00 ($5.00 × 120 × 2), or a total recovery of $17,428.80, plus reasonable attorney's fees.

The portion of the trial court's judgment which ordered that the Bank's lien on the mobile home in question be foreclosed is affirmed. The portion of the judgment which awarded the Bank the sum of $10,662.30 on its counterclaim is also affirmed. The portions of the trial court's judgment which denied the Espinozas' motion for summary judgment on their Credit Code claim and granted the Bank's motion for summary judgment thereon are reversed, and judgment is here rendered that the Espinozas recover the sum of $17,428.80 from the Bank for the Bank's violation of the Code, less, however, the amount awarded the Bank on its counterclaim. Since the Espinozas' recovery on the principal action is more than the Bank's recovery on its counterclaim, and as a severance was not ordered by the trial court, the Bank is entitled to offset its recovery against that of the Espinozas. Therefore, judgment is here rendered that the Espinozas recover the sum of $6,766.50 from the Bank, together with interest thereon from August 10, 1977, the date the trial court's judgment was signed, at the rate of nine percent (9%) per annum until paid. Rule 434, T.R.C.P.

The issues of attorney's fees are severed from the remainder of the case. *McDonald v. Savoy*, 501 S.W.2d 400 (Tex.Civ.App.—San Antonio 1973, no writ). The portions of the judgment which, in effect, denied the Espinozas any attorney's fees on their Credit Code claim is reversed, and that part of the suit is remanded to the trial court for the purpose of determining the amount which would constitute reasonable attorney's fees, as provided by Tex.Rev.Civ.Stat. Ann. art. 5069–801; likewise, the portion of the judgment which awarded attorney's fees to the Bank in the amount of $3,600.00 is also reversed, and that part of the counterclaim is remanded to the trial court for the purpose of determining the amount which would constitute reasonable attorney's fees. The costs of this appeal are assessed fifty percent (50%) to the Espinozas and fifty percent (50%) to the Bank.

AFFIRMED IN PART, REVERSED AND RENDERED IN PART, and REVERSED AND REMANDED IN PART.