**Genell BRANDON and Earl H. Staelin, Appellants,**

**v.**

**AMERICAN STERILIZER COMPANY, Appellee.**

No. 3–92–554–CV.

Court of Appeals of Texas, Austin.

June 29, 1994.

Rehearing Overruled Aug. 17, 1994.

Earl H. Staelin, Austin, for appellants.

Jeffrey R. Jury, Wilson, Grosenheider & Burns, Austin, for appellee.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

ABOUSSIE, Justice.

Genell Brandon sued American Sterilizer Company ("AMSCO") for personal injuries resulting from toxic chemical exposures on theories of products liability, deceptive trade practices,[1] breach of warranty, negligence, and gross negligence. The trial court granted AMSCO's motion for directed verdict on the deceptive trade practices and express warranty claims. The court rendered judgment on the jury's verdict for Brandon on the negligence and products liability claims, reducing the damage award relative to the

1. Deceptive Trade Practices–Consumer Protection Act, Tex.Bus. & Com.Code Ann. §§ 17.41– .63 (West 1987 & Supp.1994) ("DTPA").

**490**

jury's findings of contributory negligence and causation.

Brandon appeals the trial court's granting of AMSCO's motion for directed verdict on her claims under the DTPA and for breach of express warranty.[2] Brandon further appeals the trial court's denial of prejudgment interest for the period between the date of verdict and the date of judgment, as well as the court's award of a credit to AMSCO against Brandon's judgment for the amount exceeding the payment to Brandon by her employer's workers' compensation carrier, National Union Fire Insurance Company ("National Union"). Finally, Brandon appeals the trial court's allocation of attorney's fees awarded under the Texas Workers' Compensation Act. Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 1.01, 1989 Tex. Gen.Laws, 1, 1 (formerly Tex.Rev.Civ.Stat. Ann. art. 8308–1.01). We will affirm the trial court's judgment as to the directed verdict, the credit to AMSCO, and the allocation of attorney's fees. We will reform the judgment regarding the denial of prejudgment interest.

## BACKGROUND

Brandon worked at Seton Medical Center from December 1978 to October 1984, when she was injured by exposure to certain toxic chemicals. Brandon worked as a "cardiopulmonary equipment specialist," and part of her duties included loading hospital equipment into two gas sterilizers that use a toxic gas known as ethylene oxide to sterilize the equipment. Brandon was responsible for operating and monitoring the gas sterilizers. Seton purchased the sterilizers from AMSCO in 1977, and AMSCO was responsible for their maintenance through an annual "preventative maintenance agreement" signed by the parties. On October 29, 1984, Brandon arrived at work to find an AMSCO maintenance person apparently working on one of the sterilizers. After the AMSCO worker left, the sterilizer began to leak, exposing Brandon to toxic gas.

## STANDARD OF REVIEW

A party is entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 865 (Tex. 1982); *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). An appellate court must determine whether any probative evidence raising a fact issue on the material questions presented exists. In making this determination, the court must consider all of the evidence in the light most favorable to the party against whom the verdict was instructed and disregard all evidence and inferences to the contrary. *Qantel Business Sys. v. Custom Controls*, 761 S.W.2d 302, 305 (Tex.1988) (citations omitted); *Jones*, 638 S.W.2d at 865; *Collora*, 574 S.W.2d at 68 (citations omitted). If the appellate court finds there is any probative evidence raising a material fact issue, it must reverse the trial court's judgment and remand the cause for the jury's determination of that issue. *Qantel*, 761 S.W.2d at 304.

## DISCUSSION AND HOLDING

### Consumer Status under the DTPA

In her first point of error, Brandon argues the trial court erred in granting AMSCO's motion for directed verdict on her DTPA claim. The trial court held Brandon was not a "consumer" under the relevant provisions of the DTPA. Brandon argues she qualifies as a consumer because, even though she did not purchase the gas sterilizers, she sufficiently acquired the sterilizers, as well as AMSCO's maintenance services, pursuant to the preventative maintenance agreement ("PMA") when she was assigned to operate the equipment.

■ We recognize that "[t]he purpose of the DTPA is the protection of consumers from deceptive trade practices, and the act is to be liberally construed to achieve this underlying goal." *Star Houston, Inc. v. Kundak*, 843 S.W.2d 294, 297 (Tex.App.—Houston [14th Dist.] 1992, no writ). Accordingly, we interpret the definition of consumer broadly in a wide variety of situations. The issue before us is very difficult because it

2. Tex.Bus. & Com.Code Ann. § 2.313 (West 1986).

asks us to expand the definition of consumer even further. However, for the following reasons, we conclude that the trial court correctly found that Brandon is not a consumer under the DTPA.

■ The DTPA defines a "consumer" as "an individual ... who seeks or acquires by purchase or lease, any goods or services...." Tex.Bus. & Com.Code Ann. § 17.-45(4) (West 1987). One can qualify as a consumer under the DTPA without actually purchasing the goods or services at issue. *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985). In *Kennedy*, the Texas Supreme Court held that an employee was a consumer under the DTPA for purposes of suing on a group insurance policy, even though his employer had purchased the policy. *Id.* The court observed:

> 'Privity between the plaintiff and defendant is not a consideration in deciding the plaintiff's status as a consumer under the DTPA.... A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by contractual relationship with the defendant. The only requirement is that the goods or services sought or acquired by the consumer form the basis of his complaint.'

*Id.* at 892–93 (quoting *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983)). The court reasoned that, although the employee had not "sought" the policy benefits, he sufficiently "acquired" those benefits through his coverage by the policy's provisions. *Kennedy*, 689 S.W.2d at 892. Furthermore, even though the employee had not purchased the policy, he did acquire the policy benefits "by purchase, albeit a purchase consummated *for his benefit* by the hospital district's Board of Managers." *Id.* (emphasis added); *see also Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420 (5th Cir.1992) (holding that the son of woman who bought garage door opener was a consumer under the DTPA because a primary purpose of the purchase was to benefit the son).

While the *Kennedy* decision gives some guidance on the issue presented herein, its usefulness is limited by the fact that in *Kennedy*, the employer's primary purpose for purchasing the insurance policies was to ben-efit the employee. Left unaddressed is the issue presented here, in which an employer buys equipment primarily for the purpose of benefitting his business, but assigns employees to use the equipment.

Other courts of appeals have addressed similar situations involving consumer status under the DTPA. In *Lara v. Lile*, 828 S.W.2d 536 (Tex.App.—Corpus Christi 1992, writ denied), the Laras sued the employer of a man who had run over and killed Raul Lara. The defendant employer, Charles Lile d/b/a Raven Transport and Raven Supply ("Raven"), had contracted with Lara's employer, Heldenfels Brothers, Inc. to deliver concrete culverts for Heldenfels to use in a road construction project. One day, a Raven employee was moving a truck forward at the site when he accidentally ran over Lara. In addition to a wrongful death action, the Laras sued under the DTPA, alleging Lara's death was caused by defects and breaches of express or implied warranties and/or representations prohibited by the DTPA. Lile filed special exceptions to the Laras' pleadings, contending Lara was not a "consumer" under the DTPA, and the trial court granted the exceptions. *Id.*

On appeal, the appellate court affirmed on the DTPA issue, holding Lara was not a consumer because he had not acquired the services from Raven. *Id.* at 542. The court distinguished *Kennedy* by stating that, although a plaintiff may acquire goods or services purchased by another for his benefit, a plaintiff may *not* be considered a consumer when he has no relationship to the sales transaction involving the goods. *Id.* at 541–42. The court then concluded Lara had no such connection with the services Raven provided, stating:

> The pertinent question is what was Lara to acquire or receive from Raven. The only service performed by the trucking firm was the transportation of culverts from one location to another. Raven's trucking service was not sought, received or acquired by Lara, nor did it benefit Lara.... The only connection between Lara and Raven consisted of both parties performing work for Heldenfels, Lara as

an employee and Raven as a subcontractor.

Appellants argue that Lara had a relationship to the transaction between Heldenfels and Raven in that Lara and the other workers on the construction site 'acquired' the benefits of a safe place to work from Raven ... *[h]owever, transportation was the primary service acquired; safety was incidental, albeit essential. The primary service acquired was not for the benefit of the Heldenfels employees, and was not received or acquired by them.* *Id.* at 542 (emphasis added).

Another case addressing the issue of consumer status under the DTPA is *Hernandez v. Kasco Ventures, Inc.,* 832 S.W.2d 629 (Tex. App.—El Paso 1992, no writ). Kasco Ventures leased a warehouse to the plaintiff's employer, Miles Transportation & Distribution Co. Kasco also provided dock levelers to Miles to aid the loading and unloading of freight into the storage facility. Hernandez, a warehouseman of Miles, was injured due to a malfunctioning dock leveler. Hernandez sued Kasco under many theories, including deceptive trade practices, alleging Kasco was responsible for the dock levelers. The trial court granted summary judgment against Hernandez on all theories, and Hernandez appealed. The appellate court affirmed the summary judgment, holding Hernandez was not a consumer for purposes of the DTPA because he had not "acquired" the dock levelers. *Id.* at 634.

■ We agree with the analysis of the consumer status issue as set forth by the *Lara* and *Kasco* courts. An employee is entitled to consumer status under the DTPA on claims involving goods or services an employer purchases primarily for the employee's benefit. *Kennedy,* 689 S.W.2d at 892.

However, when an employer purchases goods or services for the primary purpose of benefitting that employer's business, and any use or benefit of those products extends to the employee only incidentally, the employee does not have standing to sue under the DTPA regarding those products.[3] Thus, the relevant issue in this cause becomes the purpose behind Seton's purchase of the AMSCO equipment and services. Because Seton may have had different underlying motives for purchasing the sterilizers and the PMA services, we will address these purchases separately.[4]

■ Regarding the sterilizers, we find no merit in Brandon's contention that in operating the equipment, pursuant to her job requirements, she "acquired" the equipment for purposes of the DTPA. Seton's purpose for purchasing the sterilizers was to sterilize the hospital equipment used in the everyday course of its business. Any benefit of the purchase extended to Seton, in the form of higher efficiency, and to its patients, in the form of a safer, more sterile environment. Accordingly, we conclude Brandon has not met her burden in proving she was a "consumer" under the DTPA with regard to the sterilizers.

■ Regarding the PMA maintenance services, after careful review of the record, we disagree that these services were purchased with the intent to benefit Brandon or any other Seton employees. Keith Lindstrom, a regional service manager for AMSCO, testified at trial that a PMA was a scheduled series of checks and inspections on the machines to replace components before they failed. A brochure issued by AMSCO to its customers described the PMA as a service that:

---

**3.** This is not to say an employee would not have a negligence or products liability claim against a manufacturer under appropriate circumstances, as was the situation in the instant cause. The jury awarded damages to Brandon both on theories of negligence and products liability. The sole issue we address here is that of a person's standing to sue under the DTPA, and should not be confused with the substantive rights of employees, in general, to recover for injuries sustained in their workplace due to defective products.

**4.** We assume, for the sake of argument, that the sterilizers and the PMA services were two separate products or purchases. However, we would reach the same result were we to find that the sterilizers were the primary product purchased and the PMA services were merely incidental benefits of that purchase. *See Lara,* 828 S.W.2d at 542.

gives your capital equipment planned maintenance service.... [The] PMA Service assures you of peak equipment performance ... whatever type of AMSCO equipment you may own. And it offers these four outstanding benefits: [1] It frees your maintenance personnel for other tasks. [2] It assures your professional and technical staffs the full use of critical apparatus. [3] It helps you protect the welfare of your patients. [4] And it maximizes the return on your capital investment.

Because we do not have the actual PMA agreement before us, we assume that the testimony of Lindstrom and the PMA brochure accurately describe the PMA services and are congruent with the terms of the actual contract.

It seems that the primary purpose of the agreement was to ensure the proper daily functioning and efficient use of the AMSCO equipment, thus saving the hospital money and providing it with properly sterilized equipment. Brandon has not pointed to any evidence indicating that Seton bought the PMA services primarily for her benefit and safety, or that leaks of the type that occurred here were even a consideration in making the purchase. Although we view the evidence in the light most favorable to Brandon, *see Qantel,* 761 S.W.2d at 305; *Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 910 (Tex. App.—Houston [1st Dist.] 1991, writ denied), this does not dismiss her burden of proving her consumer status under the DTPA. Brandon has failed to meet this burden. We overrule the first point of error.

### Standing Requirement for Express Warranties Claims

In point of error number two, Brandon contends the trial court erred in granting AMSCO's motion for directed verdict on her express warranty claim. In granting the motion, the trial court ruled Brandon did not have standing to sue AMSCO on any alleged express warranties.

■ An express warranty is created "when a seller makes an affirmation of fact or a promise to the buyer which relates to the goods sold and warrants a conformity to

the affirmation as promised." *Bormaster v. Henderson,* 624 S.W.2d 655, 660 (Tex.App.—Houston [14th Dist.] 1981, no writ). Brandon has failed to bring forward the terms of any alleged express warranty. She does not identify the express warranty nor does she refer to any part of the record where the terms of such a warranty may be located. The only reference Brandon makes to an express warranty is in the fact statement of her brief where, without citing the record, she refers to "the express warranties of safety."

■ An appellant must refer the appellate court to those portions of the record that support her argument. *Catherman v. First State Bank,* 796 S.W.2d 299, 304 (Tex.App.—Austin 1990, no writ). An appellate court is under no duty to make an independent search of the record for evidence supporting an appellant's position. *Most Worshipful Prince Hall v. Jackson,* 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); *Golden Villa Nursing Home, Inc. v. Smith,* 674 S.W.2d 343, 351 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (citing *Saldana v. Garcia,* 155 Tex. 242, 285 S.W.2d 197 (1955)); *Hale v. Ramsey,* 524 S.W.2d 436, 438 (Tex.Civ.App.—Austin 1975, no writ). Rule 74(f) of the rules of appellate procedure states:

> A brief of the argument may present separately or grouped the points relied upon for reversal. The argument shall include: (1) a fair, condensed statement of the facts pertinent to such points, *with reference to the pages in the record where the same may be found; and (2) such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue.*

Tex.R.App.P. 74(f) (emphasis added). Not only does Brandon fail to discuss the alleged express warranty sufficiently for us to determine its terms, but she also fails to cite us to any portion of the record where such terms can be found. Accordingly, we have no way to determine whether such a warranty even exists, much less what it promises. The appellant has the burden to show that the record supports her contentions and to point

out where in the record the matters complained of are shown. *Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, 234 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *Most Worshipful Prince Hall,* 732 S.W.2d at 412. Brandon has failed to meet this burden. Point of error two is overruled.

### Prejudgment Interest

In her third point of error, Brandon contends the trial court erred by refusing to award her prejudgment interest from the date of verdict to the date of judgment. The trial court rendered final judgment on July 16, 1992, over four months after the jury returned its verdict on March 6, 1992.

Because this action was commenced before the September 1, 1987, effective date of Tex. Rev.Civ.Stat.Ann. art. 5069–1.05(6) (West Supp.1994), which governs prejudgment interest in personal injury cases filed after that date, the award of prejudgment interest is governed by the Texas Supreme Court's holding in *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985). *O'Reilly v. Grafham,* 797 S.W.2d 399, 401 (Tex. App.—Austin 1990, no writ).

In *Cavnar,* the Texas Supreme Court held that personal injury plaintiffs may recover, as a matter of law, prejudgment interest on damages that have accrued by the time of judgment. *Cavnar,* 696 S.W.2d at 554. The court reasoned that denying prejudgment interest would thwart the primary objective of awarding damages in civil actions, which "has always been to compensate the injured plaintiff, rather than to punish the defendant." *Id.* at 552. The court continued:

A potential award of [prejudgment] interest advances the objective of encouraging speedy compensation to victims, and ensures that the aim of obtaining a high recovery for victims and their survivors is

not defeated by a defendant's simple strategy of delaying payment *or judgment* until the award is diminished in actual value. We agree ... that the allowance of prejudgment interest on an unliquidated tort claim will induce prompt defense consideration of settlement possibilities ... [and] is also likely to *discourage delay if the case is taken to court.*

*Id.* at 554 (citations omitted) (emphasis added).

In accordance with *Cavnar,* we conclude the trial court erred in denying Brandon prejudgment interest for the period between the time the verdict was returned and the judgment was rendered. Because the trial court erred in computing this portion of the damages, we reform the judgment to allow for prejudgment interest for the time period between March 6, 1992, and July 16, 1992. *See Ragsdale v. Progressive Voters League,* 790 S.W.2d 77, 85 (Tex.App.—Dallas), *rev'd on other grounds,* 801 S.W.2d 880 (Tex.1990) (appellate court may reform trial court judgment when trial court incorrectly computes damage award). Point of error number three is sustained.

### Settlement of Workers' Compensation Lien

In her fourth point of error, Brandon contends the trial court erred by granting AMSCO a $52,000 credit against Brandon's judgment because AMSCO paid only $30,000 to discharge intervenor National Union's workers' compensation lien. Shortly before trial, National Union agreed to accept $30,000 from AMSCO in settlement of National Union's original lien of $52,000 on Brandon's claim against AMSCO. The $52,000 represented workers' compensation benefits that National Union previously had paid to Brandon. Brandon argues that under the Texas Workers' Compensation Act ("the Act"),[5] the

---

5. The relevant portions of the Act, before its repeal in 1989, read:

Sec. 6a. Recovery from third person; subrogation; attorneys fees.... If compensation be claimed under this law by the injured employee or his legal beneficiaries, then the association shall be subrogated to the rights of the injured employee, and may enforce in the name of the injured employee or of his legal beneficiaries the liability of said other person,

and in case the recovery is for a sum greater than that paid or assumed by the association to the employee or his legal beneficiaries, then out of the sum so recovered the association shall reimburse itself and pay said costs and the excess so recovered shall be paid to the injured employee or his beneficiaries.

\* \* \* \* \* \*

(c) If at the conclusion of a Third Party action a workman's compensation beneficiary is en-

trial court should have awarded the excess $22,000 to her.

 Brandon seems to argue that National Union did not have the right to settle its subrogation claim with AMSCO for a reduced sum before trial. However, other Texas courts of appeals have held that an insurer's subrogation rights may be altered by contract. *Otis Elevator Co. v. Allen,* 185 S.W.2d 117, 120 (Tex.Civ.App.—Fort Worth 1944), *aff'd in part and rev'd in part,* 143 Tex. 607, 187 S.W.2d 657 (1945); *Foster v. Langston,* 170 S.W.2d 250, 251 (Tex.Civ. App.—San Antonio 1943, no writ). We conclude that National Union had the right to settle its subrogation claim with AMSCO before trial. It follows that the trial court properly credited AMSCO with the full $52,000. AMSCO entered into a settlement agreement with National Union, and was entitled to the benefits of that agreement. To hold otherwise would deny AMSCO the benefit of its bargain and would discourage the early settlement of claims.

Brandon argues, however, that AMSCO received a windfall by receiving a credit for the full $52,000. We disagree. In paying National Union $30,000 to settle its subrogation claim, AMSCO was taking a risk that it would lose that entire amount if Brandon did not prevail at trial. The fact that such a risk was involved precludes a conclusion that AMSCO received a windfall through the $52,000 credit.

Finally, we find no merit in Brandon's argument that she was unjustly deprived of $22,000 of her judgment. Brandon received $52,000 in benefits from National Union, with the condition that she reimburse it up to the full $52,000 with any money subsequently recovered at trial. *See* Article 8307, § 6a(a), (c). Thus, even without the agreement between AMSCO and National Union, Brandon would not have been entitled to the $22,000 she now seeks because it was rightfully National Union's under the Act. Therefore, under the agreement, Brandon lost nothing; she was in the same position she would have been had the agreement never been made. Furthermore, the Act was not intended to allow employees to receive a double recovery when pursuing both its workers' compensation claim and a claim against the third party tortfeasor. *See id.; Granite State Ins. Co. v. Firebaugh,* 558 S.W.2d 550, 553 (Tex.Civ. App.—Eastland 1977, writ ref'd n.r.e.).

We conclude the trial court did not err in granting AMSCO a $52,000 credit on the judgment rendered. Point of error number four is overruled.

### Allocation of Attorney's Fees

In point of error number five, Brandon complains the trial court erred in its allocation of attorney's fees between counsel for National Union and Brandon's counsel. She argues National Union's counsel did not "actively participate" in the representation of the case and thus should not have been allocated fifty percent of the attorney's fees under the Act.[6]

 An award of attorney's fees is within the sound discretion of the trial court, and will not be reversed absent a clear showing of abuse of discretion. *City of Austin v. Janowski,* 825 S.W.2d 786, 788 (Tex.App.— Austin 1992, no writ) (citing *Espinoza v. Victoria Bank & Trust Co.,* 572 S.W.2d 816, 828 (Tex.Civ.App.—Corpus Christi 1978, writ

---

titled to compensation, the net amount recovered by such beneficiary from the third party action shall be applied to reimburse the association for past benefits and medical expenses paid and any amount in excess of past benefits and medical expenses shall be treated as an advance against future benefit payments of compensation to which the beneficiary is entitled to receive under the Act. . . .
Act of March 28, 1917, 35th Leg., R.S., ch. 103, § 1, Tex.Gen.Laws 269, 270 (formerly Tex.Rev. Civ.Stat.Ann. art. 8307) (hereinafter "Article 8307").

6. The relevant portion of the Act states:

(b) If the association obtains an attorney to actively represent its interest and if the attorney actively participates in obtaining a recovery, the court shall award and apportion an attorney's fee allowable out of the association's subrogation recovery between such attorneys taking into account the benefit accruing to the association as a result of each attorney's service, the aggregate of such fees not to exceed thirty-three and one-third per cent (33⅓%) of the subrogated interest.
Article 8307, § 6a(b).

ref'd n.r.e.)). To constitute an abuse of discretion, the trial court's decision must be arbitrary or unreasonable. "A trial court's actions are unreasonable only if the court acted without reference to any guiding rules or principles." *City of Austin*, 825 S.W.2d at 788 (citations omitted). In determining whether there has been an abuse of discretion, an appellate court must review the evidence in the light most favorable to the action of the trial court, and as long as there is some evidence supporting the trial court's decision, it must be affirmed. *Id.*

The Act provides three ways in which an attorney might recover fees based upon a subrogation recovery: "(1) where the insurer has an attorney but he does not *actively* represent it; (2) where the worker's attorney represents both the worker and the insurer; [and] (3) where the insurer has an attorney who *actively* represents it and participates in obtaining a recovery." *City of Austin*, 825 S.W.2d at 789 n. 2; *see Hartford Ins. v. Branton & Mendelsohn, Inc.*, 670 S.W.2d 699, 701 (Tex.App.—San Antonio 1984, no writ) (citation omitted). Article 8307, § 6a(b) requires a trial court to apportion attorney's fees between attorneys, "taking into account the benefit accruing to the *association* as a result of each attorney's services." Article 8307, § 6a(b) (emphasis added); *City of Austin*, 825 S.W.2d at 790.

We conclude that counsel for National Union "actively participated" in representing National Union's interests and obtaining a recovery. The record indicates that counsel for National Union participated in the representation and recovery in the following ways: attending at least four depositions of employees at Seton Medical Center; assisting Brandon's counsel in obtaining information and depositions from representatives of Seton Hospital; responding to numerous discovery requests from AMSCO; attending two mediation conferences on behalf of National Union in order to resolve the case before trial; assisting Brandon's counsel in responding to time-consuming discovery requests; arranging for Seton facilities to be photographed and inspected by various experts with whom Brandon's counsel was dealing; and ultimately reaching a settlement agreement with AMSCO before trial as to National Union's subrogation claim.

Based on the foregoing evidence, we conclude the trial court did not abuse its discretion in finding that counsel for National Union actively participated in National Union's representation and recovery. *See International Ins. Co. v. Burnett & Ahders, Associated*, 601 S.W.2d 199 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.); *Lee v. Westchester Fire Ins. Co.*, 534 S.W.2d 392 (Tex.Civ.App.—Amarillo 1976, no writ). Brandon argues that her counsel performed "100% of the active representation of Ms. Brandon's interests...." However, as stated, the controlling factor is not who aided in Brandon's recovery, but rather who aided in National Union's recovery. This is especially true in the instant cause in which the workers' compensation carrier and the third-party tortfeasor settled before trial. Although efforts by Brandon's counsel may well have aided National Union during its settlement negotiations with AMSCO, we cannot say the trial court acted unreasonably or arbitrarily when it found that National Union's counsel also contributed to the recovery. *See City of Austin*, 825 S.W.2d at 788. Accordingly, Brandon has not demonstrated that the trial court abused its discretion by apportioning the attorney's fees equally between counsel for Brandon and counsel for National Union. Point of error number five is overruled.

We reform the judgment to award prejudgment interest to Brandon for the period between the date of verdict, March 6, 1992, and the date of judgment, July 16, 1992. As reformed, we affirm the trial court's judgment.